* William Reed SMATHERS, Appellant,

v.

MULTI–TOOL, INC./MULTI–PLAS-TICS, INC. EMPLOYEE HEALTH AND WELFARE PLAN; Multi–Tool, Inc./Multi–Plastics, Inc., as Administrator and named Fiduciary of the named Plan.

\* Amended in accordance with Clerk's Order dated 2/15/01

No. 01–1045.

United States Court of Appeals, Third Circuit.

Argued Dec. 4, 2001

Filed: July 31, 2002.

Lawrence C. Bolla [argued], Kenneth W. Wargo, Quinn, Buseck, Leemhuis, Toohey & Kroto, Erie, PA, for appellant.

Elaine C. Rizza [argued], The Rizza Group Professional Corporation, Washington, PA, for appellees.

BEFORE: ALITO, RENDELL and AMBRO, Circuit Judges.

## OPINION OF THE COURT

RENDELL, Circuit Judge.

William Reed Smathers brought this suit against Multi–Tool, Inc./Multi–Plastics, Inc. and Multi–Tool, Inc./Multi–Plastics, Inc. Employee Health and Welfare Plan (together "Multi–Tool") in the Western District of Pennsylvania seeking payment of medical claims in excess of $81,000 arising from an accident that occurred while he was driving his motorcycle under the influence of alcohol and which resulted in the amputation of his leg. The District Court granted summary judgment in favor of Multi–Tool. While the District Court was correct to apply an arbitrary and capricious standard of review to the administrator's denial of benefits, that standard should have been heightened due to Multi–Tool's conflict of interest. Because we find that the administrator's denial was arbitrary under the applicable standard, we conclude that the District Court erred in affirming its denial. Accordingly, we reverse the District Court's grant of summary judgment in favor of Multi–Tool, and will remand to the District Court with instructions to remand to the Administrator.

### I.

On August 24, 1997, around 1:15 a.m., Smathers was driving his motorcycle on Route 19 in West Mead Township, Crawford County, Pennsylvania. At the same time, eighteen-year old Jeffrey S. Southworth was backing out of a driveway onto Route 19. Southworth admitted that he saw the lights of Smathers' motorcycle coming down the road, but thought that he had the necessary time to back out. Southworth backed out of the driveway

across one lane and into the lane down which Smathers was traveling. Once he had backed into the roadway, Southworth saw Smathers' bike in his rearview mirror, but as he attempted to put the car into gear, it stalled. He then heard tires squealing and Smathers smashed into the side bumper of the car. Smathers explained that in response to coming upon the stalled car he hit both his front and rear brakes which caused his rear wheel to begin spinning to the left. Afraid that he would lose control of the bike if he continued to brake, Smathers attempted to drive around the car. He explained:

> [B]ecause of the skid caused by the braking, I had to try to [drive around the car] to the right, which meant going off the road surface because the Southworth vehicle was all the way to the edge of the road surface. As I attempted to drive around the Southworth vehicle to the right, my left leg struck it's [sic] bumper and I believe it caused me to fly off the motorcycle. At that point I lost consciousness....

After investigating the scene, the police provided a similar description of the accident, reporting that it appeared that Smathers had attempted to steer to the right of the car, but was unsuccessful and struck the car. A fifty-four foot skidmark was found leading to the site of the impact. Smathers was seriously injured in the accident, necessitating the amputation of his leg.

Both Smathers and Southworth were charged with violations arising from the accident. Southworth was charged with illegal backing pursuant to Pennsylvania Vehicle Code, 75 Pa.C.S.A. § 3702, which provides: "No driver shall back a vehicle unless the movement can be made with safety and without interfering with other traffic and then only after yielding the right-of-way to moving traffic and pedestrians." Southworth pled guilty and paid the accompanying fine. After Smathers' blood alcohol content ("BAC") was found to be 0.252 [1] he was charged with driving under the influence in violation of 75 Pa. C.S. § 3731(a)(1).[2] Smathers was admitted into an Accelerated Rehabilitative Disposition ("ARD") program overseen by the Crawford County Probation/Parole Department. His completion of the program resulted in a dismissal of the charges against him.[3]

Multi–Tool refused to pay Smathers' medical expenses arising from the accident under a provision which excludes coverage for "any charge for care, supplies, or services which are ... 8. Caused or contributed to by the Covered Person's commission or attempted commission of a felony, misdemeanor, or being engaged in an illegal occupation or activity." Multi–Tool refused Smathers' claims because the accident occurred while he was driving while intoxicated—an admittedly illegal activity. In February 1998, while the claim was pending, Multi–Tool amended its plan to incorporate a provision giving the administrator discretionary authority in making

---

1. Smathers' BAC was later corrected to be 0.217 instead of 0.252, however, this is still well over the .10 limit in Pennsylvania.

2. The statute provides: "A person shall not drive, operate or be in actual physical control of the movement of a vehicle ... while under the influence of alcohol to a degree which renders the person incapable of driving safely." 75 PA.C.S. § 3731(a)(1).

3. We have described ARD as "a rehabilitation program that allows prosecutors to avert a trial and defendants to ultimately earn a dismissal of criminal charges by satisfactorily completing a probationary program." *Cain v. Darby Borough,* 7 F.3d 377, 382 (3d Cir. 1993).

benefits determinations. Smathers subsequently brought suit under the Employees Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, in an effort to collect benefits which he argued were due to him under the plan.[4] Multi–Tool filed a motion to dismiss, which was treated by the court as a motion for summary judgment because Multi–Tool relied on material outside the pleadings. Smathers filed a provisional motion for summary judgment.[5]

The District Court determined that the administrator's decision not to provide Smathers' benefits was governed by the discretionary authority provided under the 1998 plan, and, accordingly, considered only whether that decision was arbitrary and capricious. Applying that deferential standard, the District Court granted summary judgment in favor of Multi–Tool finding that the determination by Multi–Tool, as plan administrator, was not, as a matter of law, arbitrary and capricious, and that there were no issues of material fact remaining to be considered.

## II.

As Smathers' claim for recovery of plan benefits rests on the rights provided by ERISA, the District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). We exercise jurisdiction pursuant to 28 U.S.C. § 1291. We subject the District Court's grant of summary judgment to plenary review, and we apply the same standard that the lower court should have applied. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir.2000). Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. F.R.C.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Smathers raises two interrelated issues on appeal, one procedural and one substantive. He first urges that the District Court improperly subjected the administrator's decision to an arbitrary and capricious standard of review instead of the de novo standard applicable under the plan in effect when the claim arose and was filed. Second, he claims that even if the correct standard was employed by the District Court, it wrongly determined that the administrator's consideration of the claim satisfied that standard. We will address these claims in order.

### A. *Determining the Standard of Review*

1. "Arbitrary and Capricious" or De Novo

 Before we can evaluate the propriety of the administrator's determination, we must decide whether the District Court properly applied the deferential arbitrary and capricious standard of review. The Supreme Court has instructed us to review the determinations of a plan administrator de novo unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In that event, an "arbitrary and capricious" standard is to be applied. Because Multi–Tool's plan

---

4. Count II of Smathers' complaint alleged that Multi–Tool refused to supply information in violation of ERISA. The District Court's order on that issue is not before us on appeal.

5. His motion was provisional because "questions may remain as to the amount which the Defendants owe to him and the amount of any costs, attorneys [sic] fees, or penalties to be imposed against the Defendants."

was amended on February 1, 1998 to give discretion to the administrator we need to determine whether that provision, or the earlier version, should apply, as it impacts our standard of review.[6] The amendment was implemented *after* the injury occurred (August 24, 1997), and *after* the initial claims were made (prior to January 22, 1998),[7] but *before* the administrator made its determination (January 29, 1999). The District Court explained its decision to rely on the later plan: "This [1998] Plan document was in effect when Multi–Tool considered and then denied the plaintiff's claim for benefits."

Smathers argues that he had a vested right to have his claim reviewed based on the earlier plan, and therefore, in accordance with our jurisprudence, that "right" could not be retroactively denied. We disagree. Along with our sister circuits, we have spoken of the retroactive denial of "rights" only in a narrow factual setting where the occurrence of an accident or other event resulted in the vesting of coverage or benefits prior to an amendment affecting the person's substantive rights under the plan. *See Confer v. Custom Eng'g Co.*, 952 F.2d 41, 43 (3d Cir.1991) (concluding that coverage had vested because the exclusion was not in force at the time of the accident); *see also Wheeler v. Dynamic Eng'g, Inc.*, 62 F.3d 634, 637–40 (4th Cir.1995) (determining whether *coverage* vested); *Member Svcs. Life Ins. Co. v. Amer. Nat'l Bank & Trust Co. of Sapulpa*, 130 F.3d 950, 954 (10th Cir.1997) (consid-

ering whether *benefits* had vested). This is not the situation before us.

Smathers relies heavily on our statement in *Confer* that "the change [in the plan] by means of a formal amendment could operate only prospectively." 952 F.2d at 43. In *Confer* we found that the employer could not apply a motorcycle exclusion after the fact to deny coverage for injuries previously sustained in a motorcycle accident; such a substantive change should not be applied retroactively, and the coverage in effect at the time of the accident governed. *Id.* Although the case before us also involves an insured who was involved in a motorcycle accident and was subsequently denied benefits, the similarity ends there.

Here, the plan amendment at issue did not change the coverage under the plan or substance of Smathers' benefits or his entitlement to them. Indeed, it is very likely that the company would have *denied* him benefits *before* the amendment, just as it did after. All that was changed was the scope of the administrator's discretion and authority. The relevant language inserted into the plan was:

> It is the express intent of this Plan that the Plan Administrator shall have maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding issues which relate to eligibility for benefits, to decide disputes which may arise relative to a Plan Participant's rights and to decide questions

**6.** The parties agree that the substantive provisions of the 1995 plan, in effect at the time of the accident and when the claims were filed, apply. They also agree that the language of the 1998 plan gives Multi–Tool discretion.

**7.** It is difficult to determine when the claims were first filed, but it seems clear that it was prior to February 1, 1998. There is a telling letter from a claims manager dated January 22, 1998 which states: "We are in receipt of

medical claims on the above-mentioned employee for 1997. He was in a motorcycle accident in August, 1997 and incurred charges totaling approximately $81,000." A January 27, 1998 letter goes on to speak about the consequences resulting if they "need to have Multitool fund these claims before the end of the contract year (January 30, 1998)."

of Plan interpretation and those of fact relating to the Plan. The decisions of the Plan Administrator as to the facts related to any claim for benefits and the meaning and intent of any provision of the Plan or its application to any claim will be final and binding on all interested parties.

This language does not in any way direct the administrator to decide Smathers' claim one way or the other. It sets forth the extent of the administrator's authority, which, in turn, happens to be a signal to the district court, as dictated by the Supreme Court's *Firestone* opinion, as to how it is to review the administrator's decision.

As the issue involved here is the administrator's discretionary authority to make the benefits determination, we conclude that the better approach is to look at the plan in effect on the date the administrator actually made that determination. The Court of Appeals for the Ninth Circuit adopted that approach in the recent case of *Grosz–Salomon v. Paul Revere Life Insurance Co.*, 237 F.3d 1154 (9th Cir.2001), involving similar facts and the same type of plan amendment. The court there noted: "No circuit has yet addressed which policy dictates the standard of review when an insured files her claim under a non-discretionary policy but is subsequently denied benefits under an amended regime." *Id.* at 1159. There, the claim was initially accepted, but after the company conducted an investigation into the employee's disability, it determined that she should not continue to receive benefits. The new discretionary language was added to the plan after she filed her claim, but before the administrator accepted the

claim and conducted the investigation. The court relied on two district court cases that focused "on when the plan administrator denied the claim rather than on when the claimant filed it, or when the event triggering coverage occurred." *Id.* at 1160 (citing *Blessing v. Deere & Co.*, 985 F.Supp. 899 (S.D.Iowa 1997) and *Podolan v. Aetna Life Ins. Co.*, 909 F.Supp. 1378 (D.Idaho 1995)). The court then concluded that the fact "she became permanently disabled and filed her disability claim while the first policy was in effect is irrelevant; it does not entitle her to invoke that plan's provisions in perpetuity.... [T]his court must look to the revised plan to determine the appropriate standard of review." *Grosz–Salomon*, 237 F.3d at 1160–61.

We find this reasoning to be persuasive. Here, there was no right that vested, nor is there any issue of retroactivity since the administrator's discretionary authority was in place when that discretion was exercised.[8] We also note that this reasoning is consistent with our view that the concept of "vesting" under benefit plans is to be narrowly applied, and that there is a presumption against vesting with respect to most aspects of such plans. *See Int'l Union, U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 138–41 (3d Cir.1999). Smathers cites no relevant authority that stands for the proposition that the administrator's authority (and as a result our scope of review) should be based on provisions that were in place *prior* to the administrator's authority being exercised. Procedural provisions of a plan such as this, containing a grant of discretionary authority to the administrators, are not implicated until the

---

8. We view the "prospective" operation of the new provision differently from Judge Ambro but believe our reasoning to be in accord with *Confer*. Here, the plan amendment did not alter benefits for injuries previously sustained, that would be said to have "vested" as was the situation in *Confer*. Rather, here the modification merely affected the administrator's discretion, and it did operate prospectively, applying to the administrator's decisionmaking which occurred thereafter.

administrator actually exercises that authority. *See Blessing*, 985 F.Supp. at 903. We therefore look to the plan in effect at the time benefits were denied, the 1998 plan, and, as a result, we will examine the administrator's determination using the arbitrary and capricious standard of review.

### 2. Conflict of Interest: A Heightened Standard of Review

■ Our consideration of the proper standard of review does not end there, however, because the Supreme Court has instructed that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone Tire & Rubber Co.*, 489 U.S. at 115, 109 S.Ct. 948. The potential for a conflict of interest arises because Multi–Tool both funds and administers the welfare benefits plan.[9] In *Pinto v. Reliance Standard Life Insurance Co.*, 214 F.3d 377, 379 (3d Cir.2000), we set forth a "sliding scale method, intensifying the degree of scrutiny to match the degree of the conflict." *Id.* at 379. The insured in *Pinto* brought a claim against the insurance company who funded and administered his benefits plan, and the court found the insurance company had a significant conflict of interest. *Id.* at 388–89. However, we have explained that the risk of a conflict of interest is decreased where the administrator and funder of the plan is the employer, rather than an insurance company, because the employer has "incentives to avoid the loss of morale and

higher wage demands that could result from denials of benefits" suggesting that there is at least some counter to the incentive not to pay claims. *Nazay v. Miller*, 949 F.2d 1323, 1335 (3d Cir.1991). However, our decisions also make clear that a conflict of interest can still exist in a situation where an employer is the administrator.

■ Here, Multi–Tool had purchased excess loss insurance through the Life Insurance Company of North America ("LINA") to pay any amount in excess of Multi–Tool's deductible. Thus, although Smathers' claims arising from this accident totaled approximately $81,000, Multi–Tool was only responsible for the first $30,000 (the specific deductible) which it paid provisionally to Diversified Group Administrators ("DGA"), the plan's third party administrator,[10] on January 29, 1998.[11] Normally, this $30,000 would then be paid to Smathers if he was successful, or if benefits were ultimately denied, it would be returned to Multi–Tool. However, if Multi–Tool is required to pay benefits here, it would be "over" the maximum aggregate specific deductibles it would be required to pay under the excess loss plan, and so it would get back $7,477.22 of the $30,000 it paid toward Smathers' specific deductible. Therefore, Multi–Tool would actually be out of pocket $22,522.78 if required to pay Smathers' claims.

The District Court found that these facts dictated the conclusion that there was no conflict of interest present in this case. It explained that "while [Multi–

---

9. Smathers presents no direct evidence demonstrating that the administrator's ruling was actually influenced by the presence of a conflict of interest. However, in *Pinto* we acknowledged that such evidence is rare, and the absence of direct evidence is not determinative. *Pinto v. Reliance Std. Life Ins. Co.*, 214 F.3d 377, 379 (3d Cir.2000).

10. DGA's role as the third party claims administrator should not be confused with the fact that Multi–Tool is the plan administrator under ERISA. Neither party challenges that fact.

11. As Smathers worked 50% of his time for Multi–Tool, Inc. and 50% of his time for Multi–Plastics, Inc., any amount due would be divided evenly between the companies.

Tool] administers, sponsors and self-funds a portion of Plan benefits, the balance of benefits are covered by excess loss insurance, and benefits are paid from the Plan through a third party Claims Administrator." However, the court failed to note that Multi–Tool will be out $22,522.78 if it has to pay Smathers' claims. Appellees urge that Multi–Tool has already paid the $30,000 but, clearly, it would receive that entire sum back into its coffers if the denial is upheld. Either way, the outcome of this litigation will result in the payment back to Multi–Tool of either $7,477.22 or $30,000, resulting in the expenditure of either $22,522.78 or $0. We also note that Smathers ceased to be employed at Multi–Tool in July 1998, while the payment of his claim was still under consideration. Since Smathers was no longer an employee when Multi–Tool made its decision to deny his claims, the counterbalancing of its monetary self-interest by possible concerns about the impact of its decision on morale and wage demands would thereby be lessened. The employer would still have the incentives discussed in *Nazay* in regards to its current employees, however, the incentives would not be as strong as they would if Smathers were still a Multi–Tool employee.

Our decisions in similar factual settings, even those in which we ultimately determined that there was no conflict of interest, lead us to conclude that the facts of this case do present a conflict of interest. In *Pinto*, we took the opportunity to clarify that our previous cases finding no conflict of interest did nonetheless establish the possibility that a conflict of interest

could arise in similar factual settings. 214 F.3d at 379. We explained that our opinions in *Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40 (3d Cir.1993), and *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3d Cir.1997), also involving employer administrators, did

> suggest[ ] that structural bias could heighten the review. For example, we noted that the defendants in those cases did not 'incur' a 'direct expense as a result of the allowance of benefits,' or 'benefit directly from the denial or discontinuation of benefits,' *Abnathya*, 2 F.3d at 45 n. 5; *Mitchell*, 113 F.3d at 437 n. 4, implying that a company that did profit directly would be subject to a more stringent standard.

*Pinto*, 214 F.3d at 389.[12] The important fact that clearly distinguishes this case from pre-*Pinto* cases involving employer administrators is that Multi–Tool will suffer direct financial harm—in the amount of $22,522.78—if the claim must be paid. This is not like *Kotrosits v. GATX Corp. Non–Contributory Pension Plan for Salaried Employees*, 970 F.2d 1165, 1173 (3d Cir.1992), where only a "possibility of future indirect consequences" was present, or *Abnathya*, 2 F.3d at 45 n. 5, where the company's contributions were fixed and held by a trustee, or *Mitchell*, 113 F.3d at 437, where "the Plan assets [were] administered by a trustee pursuant to a trust agreement that provides that funds 'may not be used for any purpose other than for the exclusive benefit of persons entitled to benefits under the Plan and for reasonable expenses of administering the Plan.'" We stressed in *Abnathya* the fact that the

---

12. In *Abnathya* we explained that the deferential standard of review may, unfortunately, leave "employees largely unprotected from overreaching by employers who act as the administrators of their own plans, thereby thwarting ERISA's purpose of protecting plan participants from abusive management." *Abnathya*, 2 F.3d at 45 n. 5. However, our

analysis and clarification in *Pinto*, along with *Skretvedt v. E.I. DuPont de Nemours & Co.*, 268 F.3d 167 (3d Cir.2001), and *Goldstein v. Johnson & Johnson*, 251 F.3d 433 (3d Cir. 2001), makes clear that employees will not always be left in such a compromising position.

company incurred "no direct expense as a result of the allowance of benefits, nor [did] it benefit directly from the denial or discontinuation of benefits." 2 F.3d at 45 n. 5.

In *Skretvedt v. E.I. DuPont de Nemours & Co.*, 268 F.3d 167 (3d Cir.2001), we explained that *Pinto* set forth two conditions that would warrant providing a heightened standard of review, one of them being "when a pension plan is unfunded, i.e., not 'actuarially grounded, with the company making fixed contributions to the pension fund,' 214 F.3d at 388, but rather funded by the employer on a claim-by-claim basis." 268 F.3d at 174.[13] Accordingly, heightened scrutiny is clearly appropriate in this case, because although this case involves an *employer* and not an insurance company, the conflict arises because the employer is directly funding a portion of the plan and is benefitted by denying the claims.

In *Pinto*, we discussed the application of the Supreme Court's directive that a conflict of interest should be "a factor" in reviewing the administrator's decision. 214 F.3d at 392–93 (discussing *Firestone Tire & Rubber Co.*, 489 U.S. at 115, 109 S.Ct. 948). In determining how to take that factor into account, we find the Fifth Circuit's reconciliation of the sliding scale and the arbitrary and capricious standard to be helpful, albeit imprecise. *Pinto*, 214 F.3d at 393. We explained that in *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 638 (5th Cir.1992), the Fifth Circuit "essentially reformulat[ed] the arbitrary and capricious standard for ERISA law, concluding that 'the arbitrary and capricious standard may be a range, not a point ... [it is] more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is.'" *Pinto*, 214

F.3d at 392–93 (citations omitted) (alteration in *Pinto*). In *Pinto*, we therefore directed "district courts to consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review of the benefits determinations of discretionary decisionmakers." *Id.* at 393.

In accordance with *Pinto*, we slide down the scale—according less deference to the administrator—and keep in mind the nature of Multi–Tool's financial interests as we consider whether its denial of Smathers' benefits was arbitrary and capricious. Because the conflict here is not extraordinary, we will not slide very far down the scale. Our scrutiny, however, will be somewhat heightened, and accordingly, we will conduct a more penetrating review of administrator's decisionmaking process than would normally be conducted under the arbitrary and capricious standard.

### B. Administrator's Determination

■ We must now subject Multi–Tool's decision to deny Smathers' claims for benefits to the heightened arbitrary and capricious review. We have consistently applied the arbitrary and capricious standard as outlined in *Orvosh*: "a plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan. A court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.*, 222 F.3d 123, 129 (3d Cir.2000) (internal quotations omitted). Furthermore, "[w]hether a claim decision is arbitrary and capricious requires a determination 'whether there was a reason-

---

**13.** Although this language references "pension" plans and funds, its reasoning would apply equally to welfare benefits, and indeed the facts of *Pinto* involved long-term disability benefits.

able basis for [the administrator's] decision, based upon the facts as known to the administrator at the time the decision was made.'" *Levinson v. Reliance Std. Life Ins. Co.*, 245 F.3d 1321, 1326 (11th Cir. 2001) (quoting *Jett v. Blue Cross & Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1139 (11th Cir.1989)). Any deference we might ordinarily afford this decision will be tempered due to Multi–Tool's conflict of interest. *See supra* Part II.A.2.

■ In this case, Multi–Tool does not explain the basis for its conclusion, but contends, instead, that "it was reasonable to conclude that Smathers' illegal DUI 'contributed to' the Accident and the resulting medical charges." Multi–Tool fails to appreciate that the administrator was to determine whether Smathers' intoxication "caused or contributed to" his injuries based on relevant facts. But no facts are cited. Further, it improperly attempts to put the burden on Smathers to show that Southworth caused the accident. The law is well-settled that "the insurer must prove facts that bring a loss within an exclusionary clause of the policy." *McGee v. Equicor–Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir.1992).

Multi–Tool's attorney's explanation to Smathers' attorney that Smathers' claim was denied because "all information available to the Plan Administrator indicates that Mr. Smathers' injuries occurred *while he was operating* a motorcycle *while his blood alcohol level* was 0.252%, which is over the applicable legal limit," [14] does not assist in revealing the basis it found for

the necessary causal connection.[15] (emphasis added). We note, also, that we do not find the reasoning of the District Court in *Roberts v. Carpenters Local Union*, Civ.A. No. 92–6825, 1994 WL 37737 (E.D.Pa. Feb.2, 1994), *aff'd* 37 F.3d 1488 (3d Cir. 1994) (unpublished), particularly helpful because the plan language here requires causation, or contributory causation, which is not the same standard as is set forth in the plan language there.

After conducting a full review of the record, we conclude that Multi–Tool's determination was arbitrary and capricious under the heightened standard. It is apparent to us that the administrator did not believe that it had to actually find a causal connection in the way we believe the plan in question requires. In so doing, its ruling was arbitrary and capricious. However, because the administrator misperceived its task, we will remand for it to consider in the first instance whether there is evidence from which it could reasonably conclude that Smathers' intoxication played a causative role in his injuries.

### III.

For these reasons, we conclude that the District Court erred in granting summary judgment in favor of Multi–Tool, and its judgment will be REVERSED and the case REMANDED to the District Court to be remanded to the Administrator for further proceedings consistent with this opinion.

AMBRO, Circuit Judge, concurring in part and dissenting in part.

---

**14.** His BAC was later corrected to be .217.

**15.** Multi–Tool urges that because Smathers was intoxicated, his condition *must have* affected his driving so as to cause or contribute to the accident, but we disagree. Although Smathers' blood alcohol level was very high, evidence of causation was still needed. In other words, Multi–Tool was required to point to evidence that, if Smathers' blood alcohol

level had not exceeded the legal limit, the accident would not have occurred. However, there is nothing in the police report or the record that shows that an entirely sober person faced with an emergency situation of a stalled car backing into the middle of a dark road before him might not have met the same fate.

While I concur with the judgment, I write separately because I believe that under *Confer v. Custom Engineering Co.*, 952 F.2d 41 (3d Cir.1991), we must apply the standard of review in place at the time of the accident (which would be *de novo*) and not when the benefit plan in this case was amended to give the plan administrator discretionary authority to determine eligibility for benefits (thus, if applicable, calling for an arbitrary and capricious standard). In *Confer* we held that "the change [of an employee benefit plan] by means of a formal amendment could only operate *prospectively*." *Id.* at 43 (emphasis added).[1] Because the amendment to the benefit plan here was after the accident (and indeed after Smathers' initial claims were filed, though before the plan administrator denied those claims), we should therefore review the plan administrator's denial of benefits *de novo*. Under § 9.1 of our Internal Operating Procedures, I believe that *en banc* consideration by the full Court is required before we can overrule *Confer*. Thus, on this issue I respectfully dissent.

1. I recognize that *Confer* represents a minority position. Most circuit courts hold that an ERISA cause of action accrues when benefits are denied, not at the time of the accident. *Grosz–Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1160 (9th Cir.2001); *Mason v. Aetna Life Ins. Co.*, 901 F.2d 662, 664 (8th Cir.1990); *Miles v. N.Y. State Teamsters Conference Pension and Ret. Fund Employee Pension Benefit Plan*, 698 F.2d 593, 595 (2d Cir. 1983); *Paris v. Profit Sharing Plan for Employees of Howard B. Wolf, Inc.*, 637 F.2d 357, 358 (5th Cir.1981); *Reiherzer v. Shannon*, 581 F.2d 1266, 1272 (7th Cir.1978).