

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-22-2004

# McLeod v. Hartford Life

Precedential or Non-Precedential: Precedential

Docket No. 03-1744

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"McLeod v. Hartford Life" (2004). *2004 Decisions.* Paper 542.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/542

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

IN THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT
_____

NO. 03-1744
_____

SHIRLEY MCLEOD

*Appellant*

v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY; GROUP
LONG TERM DISABILITY BENEFITS
FOR EMPLOYEES OF VALLEY
MEDIA, INC; VALLEY MEDIA, INC.

_____

On Appeal From the United States District
Court for the Eastern District of
Pennsylvania
(D.C. No. 01-cv-04295)
District Judge: Honorable Cynthia M. Rufe
_____

Argued January 12, 2004

Before: ALITO, CHERTOFF, and
BECKER, *Circuit Judge*s.

(Filed June 22, 2004 )

BARRY L. GROSS (Argued)

Stief, Waite, Gross, Sagoskin & Gilman
547 East Washington Avenue
P.O. Box 274
Newtown, PA 18940

*Counsel for Appellant*

BRIAN P. DOWNEY(Argued)
Pepper Hamilton, LLP
200 One Keystone Plaza
Harrisburg, PA 17108

*Counsel for Appellee Hartford Life &
Accident Insurance Company*

LAWRENCE M. KELLEY
Mintzer, Sarowitz, Zeris, Ledva & Meyers
1528 Walnut Street
22nd Floor
Philadelphia, PA 19102

*Counsel for Appellee Valley Media Inc.*

_____

OPINION
_____

BECKER, *Circuit Judge.*

This is an ERISA case. Plaintiff Shirley McLeod ("McLeod"), a former employee of defendant Valley Media, Inc., appeals the District Court's grant of summary judgment in favor of defendant Hartford Life and Accident Insurance Co. ("Hartford") in which the Court upheld Hartford's denial of long term disability ("LTD") benefits to McLeod based upon Hartford's interpretation of the language in McLeod's benefits policy with Hartford.

The question before us on appeal is whether Hartford wrongfully determined that McLeod, who had been receiving medical care for various ailments since 1997, but who was neither diagnosed with nor treated specifically for multiple sclerosis ("MS") until after her benefits plan became effective in 1999, should have been excluded from coverage due to the existence of a "pre-existing condition," namely MS. Consistent with our opinion in *Lawson ex rel. Lawson v. Fortis Insurance Co.*, 301 F.3d 159 (3d Cir. 2002), we hold that despite language in the benefit plan aimed to cast a broad net as to what constitutes receiving medical care for a "pre-existing condition," McLeod did not receive treatment "for" such a pre-existing condition prior to her effective date of coverage because neither she nor her physicians either knew or suspected that the symptoms she was experiencing were in any way connected with MS. Under the heightened standard of review formulated in *Pinto v. Reliance Standard Life Insurance Co.*, 214 F.3d 377 (3d Cir. 2000), the decision to deny McLeod LTD benefits was arbitrary and capricious and we will therefore reverse the District Court's grant of summary judgment to Hartford, reverse its denial of McLeod's motion for summary judgment on liability, and remand for calculation of benefits.

I. Facts and Procedural History

On January 26, 1998, McLeod was hired by Valley Media to fill a position described as "Operations – General Warehouse." The job consisted of stocking video cassettes in a warehouse and involved long periods of standing. McLeod signed up for health insurance and other benefits under the Valley Media Plan ("the Plan") with an effective date of April 1, 1999. Under the terms of the Plan, a participant is not entitled to receive benefits for any disability that stems from a "pre-existing condition." In relevant part, the Plan provides that:

> No benefit will be payable under the Plan for any Disability that is due to, contributed to by, or results from a Pre-existing Condition, unless such Disability begins:
>
> (1) after the last day of 90 consecutive days while insured during which you receive no medical care for the Pre-existing Condition; or
>
> (2) after the last day of 365 consecutive days during which you have been continuously insured under this Plan.

**Pre-existing Condition** means:

(1) any accidental bodily injury, sickness, mental illness, pregnancy, or episode of substance abuse; or

(2) any manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily injury, sickness, mental illness, pregnancy, or substance abuse;

> *for which* you received Medical Care during the 90

2

day period that ends the day before:

(1) your effective date of coverage; or

(2) the effective date of a Change in Coverage.

**Medical Care** is received when:

(1) a Physician is consulted or medical advice is given; or

(2) treatment is recommended, prescribed by, or received from a Physician

Treatment includes but is not limited to:

(1) medical examinations, tests, attendance or observation;

(2) use of drugs, medicines, medical services, supplies or equipment.

(italics supplied).

The issue in the case centers around the fact that on February 22, 1999, a date that fell within the 90 day period that ended the day before the effective date of coverage —the so-called "look-back period"—McLeod consulted Dr. Eileen DiGregorio because of numbness in her left arm. Dr. DiGregorio had already treated McLeod for a number of years for cardiac insufficiency, and for multiple bulging cervical discs whose presence had been confirmed by MRI evaluations. McLeod had also been diagnosed with hypertension and had suffered several panic attacks. It is unconstested both that Dr. DiGregorio

provided medical care for the numbness during the February 1999 visit and that she did not diagnose or otherwise suggest that McLeod might have MS at that time. McLeod continued to seek treatment for her condition over the next several months from Dr. DiGregorio, as well as from two neurologists, Drs. Emil Matarese and Clyde Markowitz, and underwent a number of neurological evaluations and MRIs, none of which produced a diagnosis of MS or even a suspicion that MS was a possible cause of the numbness and other complaints.

It was not until August 1999 that McLeod was finally diagnosed with MS, an inflammatory disease of the central nervous system. With the benefit of hindsight, a number of physicians including her treating physicians and a non-treating physician who reviewed her medical record for Hartford, attributed McLeod's various pre-coverage symptoms and ailments to MS.[1] In March

---

[1] For example, an evaluation by one of McLeod's treating neurologists dated October 27, 1999, after the MS diagnosis had already been made, states:

> [S]he developed the onset of intermittent pain and numbness in her left arm. She had one attack then [1998] and another one in February [1999], both of which resolved and then most recently has been having an aggressive attack starting in the late summer with numbness in both legs. .

3

2000, McLeod applied for short term disability ("STD") benefits. She had last worked on January 28, 2000. The Attending Physician's Statement completed by Dr. DiGregorio and submitted as part of McLeod's application provides:

> Diagnosis: Multiple Sclerosis
>
> Subjective Symptoms: Severe pain legs, feet, can't stand long, paresthesias
>
> Date of onset of this condition: 1997
>
> Dates of treatment for this condition: Progressive symptoms since 1997

McLeod's claim for STD benefits was initially approved from February 4, 2000 through February 17, 2000 and was then extended through May 4, 2000. At the time of the extension, McLeod was informed that benefits beyond May 4, 2000, would be reviewed to determine her eligibility for LTD benefits. Hartford denied McLeod's application for LTD benefits on the grounds that her disabling condition, MS, was a pre-existing condition for which LTD benefits were not payable under the Plan. Although the diagnosis of MS was not made until August 1999, more than four months after her effective date of coverage, Hartford concluded that McLeod had "received medical [care] for manifestations, symptoms, findings or aggravations relating to or resulting from Multiple Sclerosis during the 90 day period prior to [her] insured effective date of April 1, 1999 [1/1/99-3/31/99]" when she saw Dr. DiGregorio for left arm numbness on February 22, 1999.

On November 2, 2000, McLeod appealed this denial through an internal appeals mechanism. Hartford informed McLeod, by letter dated February 22, 2001, that it was upholding its determination that "the Multiple Sclerosis was a Pre-existing condition based on the 'Manisfestations, symptoms, findings, or aggravations related to' the Multiple Sclerosis."

McLeod filed a timely appeal of that decision, again in accordance with the Plan's grievance procedures. The appeal focused on McLeod's claim that she had not received treatment for MS during the look-back period, since the MS had not yet been diagnosed at that time. As part of the appeal process, Hartford forwarded McLeod's file to the University Disability Consortium for an independent medical review. The review was conducted by Dr. Brian Mercer, a neurologist. As part of the process, Dr. Mercer reviewed McLeod's medical information and spoke to her treating

---

. . The constellation of her symptom[s] is consistent with multiple sclerosis with a relapsing/remitting onset and now possibly a secondary progressive course with this most recent attack being prolonged and progressing.

4

physicians, Drs. DiGregorio and Markowitz. Based on his review of the medical records and his discussions with McLeod's treating physicians, Dr. Mercer concluded that "the records indicate that [McLeod] was treated on 2/22/99 for left arm numbness, which was a symptom and manifestation of her multiple sclerosis, albeit not yet diagnosed at that time." In consideration of all the information before it, Hartford affirmed its decision to deny LTD benefits.

McLeod then filed a complaint in the District Court alleging claims of interference with protected rights (Count I); failure to award benefits due under the terms of the Plan (Count II); breach of fiduciary duty (Count III); and breach of contract (Count IV). McLeod named Hartford, Group Long Term Disability Benefits for Employees of Valley Media, Inc., and Valley Media, Inc., as defendants. McLeod voluntarily dismissed Counts I, III and IV of her complaint as against Hartford pursuant to Fed. R. Civ. P. 41. The matter was stayed as against Hartford's co-defendants due to the bankruptcy of Valley Media, Inc.[2]

Hartford and McLeod filed cross-motions for summary judgment. The Court granted Hartford's motion on February 27, 2003. McLeod filed a timely Notice of

---

[2] On February 27, 2003, the District Court entered summary judgment as to Count II of the Complaint in favor of Hartford. On February 9, 2004, the District Court directed the Clerk to enter that order as a final judgment pursuant to Fed. R. Civ. P. 54(b).

Appeal on March 14, 2003. The Court had jurisdiction pursuant to 28 U.S.C. § 1331 because the complaint sought benefits under 29 U.S.C. § 1132(a)(1)(B). We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## II. Standard of Review

Our review of the grant of summary judgment is plenary. *See Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000). We apply the same standard of review to Hartford's decision to deny LTD benefits to McLeod that the District Court should have applied. *See Smathers v. Multi-Tool Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002). McLeod's claim arises under ERISA, where "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit Plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), in which case it must be reviewed under the arbitrary and capricious standard. *See Smathers*, 298 F.3d at 194. Under the arbitrary and capricious standard, the Court may overturn Hartford's decision "only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (quoting *Adamo v. Anchor Hocking Corp.*, 720 F. Supp. 491, 500 (W.D. Pa. 1989)).

In this case, the Plan provides Hartford with "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms of [the Plan]." Thus, Hartford's decision to deny LTD benefits to McLeod must be reviewed under the arbitrary and capricious standard unless the heightened standard of review formulated in *Pinto* applies. In *Pinto*, we held that "when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." 214 F.3d at 378. This heightened standard of review uses a sliding scale approach, intensifying the degree of scrutiny to match the degree of conflict, considering, among other factors, the exact nature of the financial arrangement between the insurer and the company. *See id*. at 392. When applying this standard, a court is directed to consider "the nature and degree of apparent conflicts" and shape its review accordingly, with the result that the less evidence there is of conflict on the part of the administrator, the more deferential the standard becomes. *Id.* at 393.

McLeod contends that Hartford both funds and administers the Plan, and that the heightened standard of review formulated in *Pinto* therefore applies. Both in its brief and at oral argument, Hartford conceded that it funded the Plan and that a heightened standard of review applied: "There is no dispute that Hartford insures the Plan and has been provided with authority to construe Plan terms and to determine eligibility for benefits. Therefore, under *Lasser* [*v.*

*Reliance Standard Life Insurance Co.*, 344 F.3d 381 (3d Cir. 2003), *cert. denied*, 72 U.S.L.W. 3553 (U.S. May 24, 2004) (No. 03-1203),] the District Court was required to review this decision under a heightened arbitrary and capricious standard."[3] While the record is not clear as to the exact nature of the funding arrangement of the Plan, we accept Hartford's concession that a heightened arbitrary and capricious standard of review applies.[4]

Given this heightened standard of review, the discretion Hartford accords itself to "determine eligibility for benefits and to

---

[3] In *Lasser*, neither party disputed on appeal the District Court's determination that because there was no "evidence of conflict other than the inherent structural conflict," of both funding and administering the plan, the correct standard of review was "at the mild end of the heightened arbitrary and capricious scale." 344 F.3d at 385.

[4] Hartford appears somewhat tentative about its concession that a heightened standard of review applies. For example, Hartford implies that there was insufficient evidence in the record that it funded the Plan to trigger a heightened standard of review and that the District Court therefore did not err when it held that the arbitrary and capricious standard of review applied. However, as noted above, Hartford did also concede that a heightened standard of review applied. Thus, despite the hedging, we accept Hartford's concession at face value.

construe and interpret all terms and provisions of [the Plan]" is not unfettered.

## III. The Plan Language

### A.

The question before us is whether the District Court erred when it concluded that a diagnosis of MS that postdated McLeod's consultation with a physician during the look-back period for numbness in her arm established a pre-existing condition such that Hartford's decision to deny LTD benefits to McLeod was justified. More specifically, could Hartford "read back" a pre-existing condition for purposes of excluding coverage when the condition itself was not diagnosed in the look-back period, especially in a situation such as this where other diagnoses were made as to the very symptoms that are now being attributed to the (alleged) pre-existing condition.

Hartford would have us hold that receiving medical care "for symptoms" of a pre-existing condition encompasses receiving care for symptoms that no one even suspected were connected with the later diagnosed ailment but which were later deemed not inconsistent with it, but a heightened standard of review will not countenance such a strained interpretation. In a case of heightened review, where the plan administrator is not afforded complete, freewheeling discretion, we must be especially mindful to ensure that the administrator's interpretation of policy language does not unfairly disadvantage the policy holder. ERISA was enacted "'to promote the interests of employees and their beneficiaries in employee benefit plans' and to 'protect contractually defined benefits.'" *Firestone*, 489 U.S. at 113 (quoting *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983); *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148 (1985)). Were the Plan's language the subject of non-heightened discretionary review, and had Hartford provided a plausible reason for its interpretation, then perhaps the result would be different. But, given Hartford's concession, heightened review applies and Hartford's suggested reading of the terms "for" and "symptom" cannot withstand that scrutiny.

Under Hartford's interpretation of the Plan, any symptom experienced before the excludable condition is diagnosed could serve as the basis for an exclusion so long as the symptom was not later deemed inconsistent with that condition. For example, a policy holder could seek medical care for shortness of breath and be diagnosed with the remnants of a very bad cold, and have a heart attack two months later. According to its interpretation, Hartford would then be able to claim that the original shortness of breath was a "symptom or manifestation" of the underlying, and undiagnosed, heart disease, rendering the heart disease a "pre-existing" condition for purposes of excluding the policy holder from LTD benefits. The problem with using this type of ex post facto analysis is that a whole host of symptoms occurring before a "correct" diagnosis is rendered, or even suspected, can presumably be tied to the condition once it has been diagnosed. Thus, any time a policy holder seeks medical care

7

of any kind during the look-back period, the "symptom" that prompted him to seek the care could potentially be deemed a symptom of a pre-existing condition, as long as it was later deemed consistent with symptoms generally associated with the condition eventually diagnosed.

The language at issue before us revolves around the meaning of two terms: "for" and "symptom." The Hartford Plan defines neither. We have already undertaken the analysis of "for" in *Lawson,* 301 F.3d 159. There, Elena Lawson was taken to the emergency room two days before her insurance policy became effective, for what was initially diagnosed as a respiratory tract infection. One week later, after the effective date of her policy, she was correctly diagnosed as having leukemia. The insurance company denied coverage of medical expenses relating to the leukemia on the ground that it was a pre-existing condition for which Lawson received treatment prior to the effective date. Lawson's parents, acting on her behalf, sued for breach of contract and we affirmed the District Court's grant of their motion for summary judgment.

The *Lawson* panel framed the issue in the following way:

> The central issue in this case is whether receiving treatment for the symptoms of an unsuspected or misdiagnosed condition prior to the effective date of coverage makes the condition a pre-existing one under the terms of the

insurance policy. In other words, we must determine whether it is possible to receive treatment "for" a condition without knowing what the condition is.

*Id*. at 162.

Addressing this issue, the *Lawson* panel held that the word "for" "has an implicit intent requirement" and that "it is hard to see how a doctor can provide treatment 'for' a condition without knowing what that condition is or that it even exists." *Id*. at 165. In reaching this conclusion, the Court engaged in a detailed analysis of other courts' renderings of the word "for" in similar contexts, noting that although there are differing readings of what constitutes receiving treatment "for" a condition, the word "for" itself must, by definition, include a notion of intentionality. *See id.* ("'for' is 'used as a function word to indicate purpose'" (quoting *Webster's Ninth New Collegiate Dictionary* 481 (1986))).

As quoted above, the Plan at issue here defines a pre-existing condition, in relevant part as:

> (2) any manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily injury, sickness, mental illness, pregnancy, or substance abuse;
>
> *for which* you received Medical Care during the 90 day period that ends the day

8

before:

(1) your effective date of coverage

(italics supplied).

McLeod contends that in order to have been properly denied coverage under the Plan, she would have had to receive care from a physician *for* the MS or *for* the "manifestations, symptoms, findings, or aggravations" of MS during the look-back period. She submits that intentionality is a key component of receiving medical care and that the presence of the word "for" in the policy language is crucial.

In *Pilot Life Insurance. Co. v. Dedeaux,* 481 U.S. 41, 56 (1987), the Supreme Court noted that Congress intended that "a federal common law of rights and obligations under ERISA-regulated plans would develop." Importing and extending the logic of *Lawson*, a contract case, into the ERISA context, is consistent with that teaching. Finding the *Lawson* analysis persuasive, we construe the term "for" to contain the *Lawson* element of intentionality. Given that construction, Hartford's interpretation must be rejected at all events, and certainly when a heightened standard of review applies.

## B.

If McLeod's case presented nothing more than a dispute over whether she had received treatment for MS (as opposed to the symptoms of MS), then the only question before us would be whether we could apply the straightforward logic of *Lawson* to an ERISA case where the heightened *Pinto*

review obtains. Upon finding—as we have in this case—that the administrator's discretion was not unlimited and that the heightened standard of review applies, we would be compelled to declare that Hartford's denial of benefits was unjustified since it is undisputed that McLeod did not receive treatment for MS during the look-back period. There is, however, one significant difference between McLeod's case and the one presented in *Lawson*: Here, the policy language is more precise and encompasses a broader range of elements in its definition of what constitutes a pre-existing condition than did the policy at issue in *Lawson*.

In the Plan at issue here, a pre-existing condition includes medical care received for any "*manifestations*, *symptoms*, *findings*, or *aggravations* related to or resulting from such accidental bodily injury, sickness, mental illness, pregnancy, or substance abuse" (emphasis added) as opposed to the policy at issue in *Lawson* which defined a pre-existing condition as a "Sickness, Injury, disease or physical condition for which medical advice or treatment was recommended by a Physician or received from a Physician" during the relevant look-back period. *Lawson,* 301 F.3d at 161.[5]

---

[5] The Hartford Plan's definition of "medical care" is also extremely broad and seems to encompass virtually any contact between the patient and the physician, even absent some affirmative act on the part of the physician: "Medical Care is received when: (1) a Physician is consulted

Hartford places great stock in the difference in the language of the two policies, arguing that "[u]nlike the Plan in this case, the *Lawson* policy's definition of pre-existing condition did not encompass treatment for symptoms of a sickness." At first blush, this distinction seems noteworthy, and the fact that the Hartford Plan includes words such as "manifestations" and "symptoms," which the policy at issue in *Lawson* did not, seems potentially significant.[6]  The District Court certainly thought that to be the case when it stated that: "The Plan does not require that a participant's disabling condition be *diagnosed* within the look-back period in order for it to be considered a 'Pre-Existing Condition'; rather, it merely requires that a participant receive medical care for a *symptom* or *manifestation* of the condition during the look-back period." *McLeod v. Hartford Life & Accident Ins. Co.*, 247 F. Supp. 2d 650, 660 (E.D. Pa. 2003).  The Court explained that it was "eminently reasonable for Hartford to conclude that when Plaintiff sought treatment from Dr. DiGregorio for numbness in her left side in February 1999, Plaintiff sought treatment for a 'manifestation' or 'symptom' of her MS." *Id.*  We disagree.

As stated above, Hartford does not define the term "symptom."  A dictionary definition of the word "symptom" reads:

> Symptom: 1. *Med.* A functional or vital phenomenon of disease; any perceptible change in any organ or function due to morbid conditions or to morbific influence, especially when regarded as an aid in diagnosis.  *Symptoms* differ from *signs* in the diagnosis of a disease in that the former are functional phenomena, while the latter are incidental or experimental.
>
> 2. That which serves to

---

or medical advice is given; or (2) treatment is recommended, prescribed by, or received from a Physician."  At oral argument, we raised the question whether McLeod was precluded from receiving LTD benefits merely for having consulted with a physician during the relevant look-back period.  We conclude, however, that the language of the policy dictates that the medical care at issue must be specifically tied to the pre-existing condition or to the symptoms thereof in order for the exclusion to apply: "Pre-existing condition means: (1) any accidental bodily injury, sickness . . . or (2) any manifestations, symptoms . . . *for which* you received Medical Care . . . ." (emphasis added).  As we discuss below, just as a symptom can only be a symptom if the underlying condition causing the symptom is known or suspected, so too medical care for that condition or symptom can only be received if the condition is known or suspected.

[6] We limit our discussion to the term "symptom" because "symptom" was the term focused on by Hartford both in its brief and at oral argument.

point out the existence of something else; any sign, token, or indication.

*Funk & Wagnalls New Standard Dictionary of the English Language* 2246 (1942).

It appears to us from this definition that a "symptom" is a meaningful term only because it is a "symptom" in relation to something else. McLeod's symptom of numbness became relevant as one the Plan used to exclude her from coverage based on a pre-existing condition only once it was deemed a "symptom of MS." If it were just a random "symptom" of some undiagnosed ailment, then Hartford would not be concerned with it. Given that the symptom becomes a factor in the exclusion process only once it is tied to the diagnosis of the sickness, in this case MS, we do not see on what basis Hartford can successfully argue that there exists a significant difference between the language of the Hartford Plan and the language of the insurance policy in *Lawson*. Indeed, the Hartford Plan still bases the exclusion on "symptoms . . . *for which* you received Medical Care." (emphasis added). This construction simply begs the obvious question: symptoms of what? Hartford offers no satisfactory answer to this question.

In *Lawson*, we sought to avoid precisely the type of ex post facto denial of benefits that Hartford has undertaken here:

> Although we base our decision on the language of the policy, we note that considering treatment for symptoms of a not-yet-diagnosed condition as equivalent to treatment of the underlying condition ultimately diagnosed might open the door for insurance companies to deny coverage for any condition the symptoms of which were treated during the exclusionary period. "To permit such a backward-looking reinterpretation of symptoms to support claims denials would so greatly expand the definition of preexisting condition as to make that term meaningless: any prior symptom not inconsistent with the ultimate diagnosis would provide a basis for denial."

301 F.3d at 166 (quoting *In re Estate of Monica Ermenc*, 585 N.W.2d 679, 682 (Wis. Ct. App. 1998)).

While this statement is dicta, it was considered dicta, which we find persuasive. Consistent with *Lawson*'s persuasive reasoning, and the foregoing explanation of the rationale of applying it to an ERISA context, we hold that the phrase "symptoms . . . for which you received Medical Care" in the Hartford policy necessarily connotes an intent to treat or uncover the particular ailment which causes that symptom (even absent a timely diagnosis), rather than some nebulous or unspecified medical problem. To hold otherwise would vitiate any meaningful distinction between symptoms which are legitimately moored to an "accidental bodily injury, sickness, mental illness, pregnancy, or episode of substance

11

abuse," and those which are not. It is simply not meaningful to talk about symptoms in the abstract: Seeking medical care for a symptom of a pre-existing condition can only serve as the basis for exclusion from receiving benefits in a situation where there is some intention on the part of the physician or of the patient to treat or uncover the underlying condition which is causing the symptom.

Such a holding does not mean that we require that a "correct" diagnosis be made before the effective date of a policy in order for an insurance company to be able to deny coverage based on a pre-existing condition. In *Lawson*, we explained the difference between a "suspected condition without a confirmatory diagnosis" and "a misdiagnosis or an unsuspected condition manifesting non-specific symptoms." 301 F.3d at 166. Despite numerous consultations with physicians and multiple MRIs which could have potentially revealed the existence of MS before the effective policy date, neither McLeod nor her physicians ever suspected that she was suffering the effects of MS. Indeed, as we have explained above, McLeod received on-going treatment for a host of other ailments for the years preceding the MS diagnosis with no suspicion on anyone's part that she was not receiving proper medical care. Under those circumstances, we are confident that McLeod's case is one either of "misdiagnosis" or of "unsuspected condition manifesting non-specific symptoms" rather than a "suspected condition without a confirmatory diagnosis." While there were multiple opportunities for the presence of

MS to be revealed through the various testing McLeod underwent during the look-back period, none of the tests ever linked the symptoms she was experiencing to MS. We therefore conclude that the District Court erred as a matter of law when it held that Hartford's determination that McLeod had received medical care for symptoms of MS during the look-back period was not arbitrary and capricious.

## IV. Conclusion

For the foregoing reasons, the judgment of the District Court will be reversed and the case remanded to the District Court with instructions to enter an order denying Hartford's motion for summary judgment and granting McLeod's motion for summary judgment, and for calculation of the LTD benefits due to McLeod.