**Shirley McLEOD, Plaintiff,**

v.

**HARTFORD LIFE AND ACCIDENT, INSURANCE COMPANY, et al., Defendants.**

**Civil Action No. 01–4295.**

United States District Court, E.D. Pennsylvania.

Feb. 27, 2003.

Clyde W. Waite, Stief, Waite, Gross, Sagoskin & Gilman, Newtown, PA, for Plaintiff.

Albert H. Manwaring, IV, Pepper Hamilton, LLP, Phila, PA, Brian P. Downey, Pepper, Hamilton & Scheetz, Harrisburg, PA, Michael G. Wilson, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Defendant.

### MEMORANDUM

RUFE, District Judge.

Plaintiff Shirley McLeod brought this suit for alleged wrongful termination of benefits in violation of ERISA § 1132(a)(1)(B). Presently before the Court are cross-motions for summary judgment. For the reasons set out below, Defendant's motion is granted and Plaintiff's motion is denied.

### I. STANDARD OF REVIEW ON SUMMARY JUDGMENT

The underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Under Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Because the Court is confronted with cross-motions for summary judgment, the Court must consider each motion individually, and both parties bear the burden of establishing a lack of genuine issues of material fact. *Reinert v. Giorgio Foods, Inc.,* 15 F.Supp.2d 589, 593–94 (E.D.Pa. 1998). The Court will first address Defendant's motion, and thus all facts recited below will be viewed and all reasonable inferences will be drawn in favor of Plaintiff. Part II below discusses the procedural history of this case, Part III below addresses the applicable standard of review under ERISA, and Part IV discusses the decision to deny benefits.

### II. PROCEDURAL HISTORY

Valley Media, Inc. hired Plaintiff on January 26, 1998, and Plaintiff subsequently enrolled in her employer's disability benefit plan (the "Plan"), which the parties agree is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). Plaintiff's effective date of coverage under the Plan was April 1, 1999. Defendant Hartford Life and Accident Insurance Company ("Hartford" or the "administrator") administers the Plan and makes all eligibility determinations.[1]

---

1. Valley Media, Inc. and its Group Long Term ... Disability Benefits For Employees of Valley

Plaintiff became disabled due to Multiple Sclerosis ("MS") on January 28, 2000. *See* Ex. D, Application for Short Term Disability Benefits, attached to Defendant's Motion.[2] Plaintiff's application for short term benefits was initially approved through May 4, 2000, at which time Hartford began an investigation into her eligibility for long term disability benefits. *See* Ex. X, Letter from Hartford to Plaintiff, dated May 3, 2000.

Plaintiff completed her application for long term disability benefits on May 14, 2000. *See* Ex. Z. On October 10, 2000, Hartford denied Plaintiff's application, claiming that her disabling condition, MS, was a pre-existing condition for which long term disability benefits were not payable under the Plan. *See* Ex. BB, Letter from Hartford to Plaintiff dated October 10, 2000. In its denial letter Hartford acknowledged that although the diagnosis of MS was not formally made until later in 1999, Plaintiff had received medical care for manifestations, symptoms, findings, or aggravations relating to or resulting from MS during the ninety-day period immediately prior to her insured effective date of April 1, 1999 (*i.e.*, January 1, 1999 to March 31, 1999, or the "look-back period"). In addition, there was not a period of ninety consecutive days while Plaintiff was insured during which she did not receive medical care for manifestations or symptoms related to MS. Under the terms of the Plan, Hartford explained, long term disability benefits were not payable in these circumstances. *See id.*

On November 2, 2000, Plaintiff appealed Hartford's denial. *See* Ex. CC, Letter from Plaintiff's attorney to Hartford. Hartford upheld its initial denial of benefits in a February 22, 2001 letter, affirming its conclusion that MS was a pre-existing condition excluded from coverage under the Plan. *See* Ex. EE, Letter from Hartford to Plaintiff's attorney.

On March 8, 2001, Plaintiff made a second appeal, this time seeking review of the February 22, 2001 denial of her appeal. *See* Ex. FF, Letter from Plaintiff's attorney to Hartford. Hartford forwarded Plaintiff's file to the University Disability Consortium for an independent medical review by Dr. Brian Mercer, a neurologist. Dr. Mercer reviewed the file, spoke to Plaintiff's treating physicians, and ultimately concluded that the records indicated that Plaintiff was treated for left arm numbness during the look-back period, and that such numbness was a symptom and manifestation of her MS, albeit not diagnosed at the time. *See* Ex. GG at HLI000049 HLI000050, Letter from Dr. Mercer to Hartford, dated May 29, 2001. On July 10, 2001, Hartford affirmed its earlier decisions to deny benefits. *See* Ex. JJ, Letter from Hartford to Plaintiff's attorney.

On August 23, 2001, Plaintiff filed the instant action alleging interference with protected rights (Count I); failure to award benefits due under the terms of the Plan (Count II), breach of fiduciary duty (Count III); and breach of contract (Count

---

Media, Inc. (the "Plan") are also named as Defendants in this action. On March 7, 2002, Valley Media, Inc. filed a Suggestion of Bankruptcy and Applicability of the Automatic Stay [Doc. # 11]. The petition for bankruptcy, filed on November 20, 2001, operates as a stay on Plaintiff's claims against Valley Media, Inc. and the Plan itself. *See* 11 U.S.C. § 362(a)(1). Therefore, this case has proceeded against Hartford alone, and today's decision relates to Hartford only. *Cf. Berk v.*

*Ascott Inv. Corp.*, 759 F.Supp. 245, 248 n. 1 (E.D.Pa.1991) ("Although the debtor ... falls under the protection of the automatic stay provision found at 11 U.S.C. § 362(a), this action continues against the other defendants in the case at bar.").

**2.** All exhibits referred to herein are attached to Defendant's Motion for Summary Judgment, unless otherwise noted.

IV). Plaintiff voluntarily dismissed Counts I, III, and IV in November 2001. The parties filed the instant cross-motions for summary judgment in July and August of 2002. Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331.

## III. *ERISA STANDARD OF REVIEW*

Before reviewing the propriety of denying disability benefits to Plaintiff, the Court must determine what standard applies in reviewing Hartford's decision. In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) [of ERISA] is to be reviewed under a *de novo* standard, unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." When the plan confers such discretion, an "arbitrary and capricious" standard of review applies. *Smathers v. Multi–Tool Inc./Multi–Plastics, Inc. Employee Health and Welfare Plan*, 298 F.3d 191, 194 (3d Cir.2002).

The Plan in this case grants to Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." Ex. A at HLI000598. In light of this broad grant of authority to interpret the terms of the Plan and to determine eligibility for benefits, this Court will review Hartford's decision under the arbitrary and capricious standard, rather than under a *de novo* standard. *See Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 438 (3d Cir.1997) (holding similar plan language precludes *de novo* review).

■ Consideration of the proper standard of review does not end with a determination that the arbitrary and capricious standard applies. "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" *Smathers*, 298 F.3d at 197 (quoting *Firestone*, 489 U.S. at 115, 109 S.Ct. 948). In the Third Circuit, where such a conflict of interest exists, courts adjust the arbitrary and capricious standard using a "sliding scale method, intensifying the degree of scrutiny to match the degree of conflict." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 379 (3d Cir.2000). In contrast to a court's review of the administrator's decision, a court is permitted to examine evidence outside of the administrative record to determine whether there is a conflict of interest. *See id.* at 395; *Dorsey v. Provident Life and Acc. Ins. Co.*, Civ.A.No.01 1072, 2001 WL 1198642, at *8 (E.D.Pa. Oct.5, 2001).

■ Such heightened review is appropriate "either when the plan, by its very design, creates a special danger of a conflict of interest, or when the beneficiary can point to evidence of specific facts calling the impartiality of the administrator into question." *Skretvedt v. E.I. DuPont de Nemours and Co.*, 268 F.3d 167, 174 (3d Cir.2001) (quoting *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 442 (3d Cir.2001)). The *Pinto* court addressed the very situation alleged to exist here, *i.e.*, "the insurance company-as-funder-and-administrator context," a plan design that creates a danger of conflict because "the fund from which monies are paid is the same fund from which the insurance company reaps its profits." 214 F.3d at 378. In *Pinto*, the Third Circuit held that when an insurance company "both funds and administers benefits, it is generally acting under a conflict of interest that warrants a heightened form of the arbitrary and capricious review." *Id.* However, the court also noted that such arrangements are not uniform

in their structure or design, and that certain variations could present meaningful differences that may affect the standard of review. *Id.* at 383 n. 3 ("Any such difference [in the arrangement] might affect a district court's assessment of the incentives of an administrator/insurer and therefore affect the nature of its review.").

■ Here, Plaintiff has failed to present any evidence that goes to the question of Hartford's potential conflict of interest.[3] While it is conceded that Hartford *administers* the Plan, the Court cannot simply accept Plaintiff's contention that Hartford also *funds* the Plan without any evidence to that effect. The Third Circuit has noted that the Supreme Court in *Firestone* implicitly adopted a position placing the burden on the claimant to demonstrate that heightened review should apply. *See Kotrosits v. GATX Corp. Non–Contributory Pension Plan for Salaried Employees,* 970 F.2d 1165, 1172 (3d Cir.1992) ("where the *claimant demonstrates* that it would be inequitable to defer to the plan administrator, stricter scrutiny of his decision is in order") (emphasis supplied); *see also Kutner v. UNUM Life Ins. Co. of Am.,* No. Civ.A. 99–800, 2000 WL 295104, at *6 (E.D.Pa. Mar.21, 2000) (noting that administrator "does not have the burden of rebutting [the claimant's] assertion that there is a conflict of interest, but rather [the claimant] has the burden of providing this Court with specific evidence that a conflict exists"). The claimant in this case has failed to meet her burden. She has come forward with no evidence as to the Hartford Plan's funding mechanism, or any other "specific facts calling the impartiality of the administrator into question."

*Skretvedt,* 268 F.3d at 174. Without any such evidence, the Court cannot conclude that Hartford was acting under a conflict of interest when it denied Plaintiff's benefits. Accordingly, the Court will review the Administrator's decision under the ordinary arbitrary and capricious standard.

The arbitrary and capricious standard requires that a court must not disturb a plan administrator's interpretation of a plan if it is reasonable. *Dewitt v. Penn–Del Directory Corp.,* 106 F.3d 514, 520 (3d Cir.1997). In other words, a court must defer to the plan administrator unless the administrator's decision was "without reason, unsupported by substantial evidence, or erroneous as a matter of law." *Pinto,* 214 F.3d at 393. However, such deference is not required if the decision is "clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 41 (3d Cir.1993). "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits." *Mitchell,* 113 F.3d at 440. In conducting its review of the administrator's decision, a court must look to the "record as a whole," which "consists of that evidence that was before the administrator when he made the decision being reviewed."[4] *Id.*

## IV. DISCUSSION

Hartford contends in its motion that it was justified in denying Plaintiff's application for long term disability benefits in light of the Plan language, the information presented in Plaintiff's application, supple-

---

3. Defendant claims that Plaintiff took no discovery on the issue of Hartford's conflict of interest, nor on any other issues. *See* Defendant's Mem. in Opp. at 6 [Doc. # 18].

4. It is not entirely clear whether all of the exhibits attached to Defendant's Motion for

Summary Judgment were part of the administrative record when Hartford denied Plaintiff's claim for benefits. Plaintiff has not objected to their submission or consideration in the matter *sub judice,* however, leaving the Court with no reason to believe they were not.

mental information provided by her attorney, and information contained in her medical file. The Court will review the basis for Hartford's decision below, and it will defer to this decision unless it was "without reason, unsupported by substantial evidence, or erroneous as a matter of law." *Pinto,* 214 F.3d at 393.

### A. The Terms of the Plan

Under the Plan, participants are not entitled to receive benefits for any disability that is related to a pre-existing condition. Specifically, the Plan provides:

**PRE–EXISTING CONDITIONS LIMITATIONS**

. . .

**Are there any other limitations on coverage?**

No benefit will be payable under the Plan for any Disability that is due to, contributed to by, or results from a Pre-existing Condition, unless such Disability begins:

(1) after the last day of 90 consecutive days while insured during which you receive no medical care for the Pre-existing Condition; or

(2) after the last day of 365 consecutive days during which you have been continuously insured under this plan.

Ex. A at HLI000621. "Pre-existing Condition" is defined in the Plan as:

(1) any accidental bodily injury, sickness, mental illness, pregnancy, or episode of substance abuse; or

(2) any manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily

injury, sickness, mental illness, pregnancy, or substance abuse;

for which you received Medical Care during the 90 day period that ends the day before . . . your effective date of coverage. . . .

*Id.* at HLI000622. There is no dispute between the parties over whether Plaintiff received "Medical Care" or "Treatment," or that MS is the "sickness" at issue in this case.[5]

Defendant interprets the Plan to mean that a participant who received medical care within a ninety day period before her effective date of coverage (the "look-back period") for a symptom or manifestation of a sickness is *not* eligible to receive benefits *unless,* prior to becoming disabled, one of the following two conditions is met: (1) that medical care is followed by a ninety day period while insured in which she does not receive medical care; or (2) she has been continuously insured under the Plan for 365 days. Defendant contends that Plaintiff cannot receive disability benefits because she received medical care for symptoms of MS during the look-back period, and she cannot satisfy either condition.

Plaintiff's effective date of coverage was April 1, 1999. Thus, Defendant argues, if she received medical care for MS or any symptom of MS during the ninety day look-back period of January 1, 1999 to March 31, 1999, she is not entitled to benefits unless she can establish that she went for a period of ninety days thereafter while insured during which she did not receive medical care.[6] Plaintiff has not set forth

---

**5.** Plaintiff contends in her Motion for Summary Judgment that despite her request, Defendant failed to provide her with the Plan documents. Yet, exhibits submitted with Plaintiff's own motion reflect correspondence between counsel for both parties that discusses transmission of the Plan. *See* Selected Portions of Administrative Record at HLI000005,

HLI000006, HLI000084, HLI000094, attached to Plaintiff's Motion for Summary Judgment.

**6.** Plaintiff became disabled in January 2000, and thus was not continuously insured under the Plan for 365 days, making the second condition inapplicable.

any competing interpretation of the Plan, and appears to agree substantially that this case turns on whether she received medical care during the look-back period. *See, e.g.,* Plaintiff's Motion for Summary Judgment at 2. Accordingly, the Court will turn to a discussion of Plaintiff's medical treatment history.

### B. Plaintiff's Medical Treatment History

Medical records submitted with Defendant's Motion for Summary Judgment reflect that Plaintiff began reporting to her physicians a numbness or tingling in her left arm as early as 1996. *See* Exs. F through K. On February 22, 1999, during the look-back period, Plaintiff met with Dr. Eileen R. DiGregorio, and complained that her left side felt numb, and that she was experiencing intermittent pain. *See* Ex. M. Plaintiff continued to seek treatment from various physicians for these symptoms during the next several months. *See* Ex. N (May 17, 1999 physician progress notes, recording "left arm tingling" and "left arm paresthesias")[7]; Ex. O at HLI000286 (May 26, 1999 physician letter noting Plaintiff's complaints of "persistent numbness and paresthesias of the left arm"); Ex. P (July 19, 1999 physician record, noting "numbness in both arms"); Ex. Q at HLI000491 (July 23, 1999 physician record noting "numbness left arm and both legs"); Ex. R at HLI000416 (Aug. 5, 1999 physician letter discussing evaluation of "lower extremity numbness"); Ex. S (Aug. 12, 1999 physician letter discussing MRI results); Ex. T at HLI000414 (Sept. 2, 1999 physician letter noting "lower extremity paresthesias" and "uncomfortable sensation" in left arm); Ex. E at HLI000377 (Oct. 27, 1999 physician's letter noting "numbness in the left arm had been on and off and most recently the symptoms had

been persistent in the left arm"); Ex. V (Dec. 7, 1999 physician letter discussing MRI results). Defendant claims that this is not an exhaustive list of Plaintiff's treatment history, but avers that this list of physician consultations is sufficient to demonstrate that Plaintiff did not have a treatment-free period of ninety consecutive days while insured. The Court finds that this conclusion is reasonable and supported by the administrative record submitted with Defendant's motion.

■ The only remaining question, then, is whether Plaintiff received medical care for a symptom or manifestation of MS during the look-back period of January 1, 1999 to March 31, 1999. In support of this contention Defendant points to an October 27, 1999 letter from one of Plaintiff's treating physicians, Clyde Markowitz, M.D., in which he describes Plaintiff's treatment history. *See* Ex. E. Dr. Markowitz writes:

> Shirley McLeod is a 47–year–old woman with *a history dating back to last year [i.e., 1998] when she developed the onset of intermittent pain and numbness in her left arm. She had at least one attack then [i.e., in 1998] and another one in February [1999],* both of which resolved and then most recently has been having an aggressive attack starting in late summer with numbness in both legs.... *The constellation of her symptom[s] is[ ]consistent with multiple sclerosis* with a relapsing/remitting onset and now possibly a secondary progressive course with this most recent attack being prolonged and progressing.

*Id.* at HLI000379 (emphasis and bracketed material supplied). Defendant contends that Plaintiff's February 1999 "attack" of numbness referenced by Dr. Markowitz is the same numbness that led Plaintiff to

---

**7.** "Paresthesia" is defined as "a sensation of pricking, tingling, or creeping on the skin that has no objective cause." Merrian–Webster's Collegiate Dictionary 842 (10th ed.2001).

seek treatment from Dr. DiGregorio on February 22, 1999. *See* Ex. M (Dr. DiGregorio's notes from Feb. 22, 1999 office visit, noting Plaintiff's complaint of left side numbness). Defendant argues that Dr. Markowitz's diagnosis confirms that when Plaintiff sought treatment from Dr. DiGregorio, such treatment was addressing a symptom or manifestation of MS. Therefore, so the argument goes, Plaintiff received medical care for a symptom or manifestation of MS during the look-back period, and Hartford was justified in denying her claim for benefits under the pre-existing condition limitation in the Plan.

In addition to Dr. Markowitz's October 27, 1999 letter, Defendant relies on material in Plaintiff's March 2000 application for short term disability benefits, which includes Dr. DiGregorio's "attending physician statement," dated March 10, 2000. *See* Ex. D at HLI000113. In her statement, Dr. DiGregorio identifies her diagnosis as "multiple sclerosis"; describes Plaintiff's symptoms as "severe pain legs, feet; can't stand long"; identifies the "date of onset" of Plaintiff's condition as *"1997"*; and describes the dates of treatment for the condition as *"progressive symptoms since 1997." Id.* (emphasis supplied).

Defendant also points to statements in Plaintiff's subsequent May 14, 2000 application for long term disability benefits. *See* Ex. Z. Plaintiff filled out a form questionnaire accordingly (Plaintiff's responses in italics):

What were your first symptoms?

*Numbness and burning of arms and feet*

When you first noticed them?

*Approx. 2 yrs. ago*

Date you were first treated by a physician?

*Approx. 8–98*

*Id.* at HLI000549. Defendant contends that these admissions further confirm that

Plaintiff was experiencing symptoms of MS as early as 1998.

Dr. Markowitz submitted an attending physician's statement for Plaintiff's long term disability application, wherein he identifies his diagnosis as "multiple sclerosis"; describes Plaintiff's subjective symptoms as "Severe leg pain, problems walking, leg weakness"; and identifies November 1998 as the date of onset of Plaintiff's condition. *Id.* at HLI000552. A few weeks later, in his June 5, 2000 Clinical Evaluation Note, Dr. Markowitz describes Plaintiff's medical condition and history in similar fashion, once again linking numbness in her left arm with a diagnosis of multiple sclerosis:

On review of [Plaintiff's] history she had a first neurological event in November 1998 at which time she had developed numbness of the left arm with pain. This resolved over a period of weeks. She had *a second attack in February 1999 which again involved the left arm* and again resolved spontaneously.... Her MRI is suggestive of *multiple sclerosis.*

Ex. AA (emphasis supplied).

Plaintiff contends that her left arm symptoms may have been attributable to another of Plaintiff's previously diagnosed conditions, cervical radiculopathy. However, one of Plaintiff's treating physicians, Dr. Emil L. Matarese, rejected this theory in September 1999. *See* Ex. T at HLI000414 ("This patient's generalized paresthesias are highly suspicious for a primary demyelinating disorder such as multiple sclerosis.... As previously discussed, I do not believe her left arm symptoms are on the basis of radiculopathy."). Plaintiff's other treating physicians also linked the February 1999 symptoms with Plaintiff's MS. *See* Ex. D at HLI000113 (Dr. DiGregorio listing "1997" as "date of onset" of Plaintiff's MS, and identifying

"progressive symptoms since 1997"); Ex. E at HLI000379 (Dr. Markowitz letter stating "The constellation of her symptom[s] is[ ]consistent with multiple sclerosis. . . ."). In addition, Dr. Mercer rejected the possibility that Plaintiff's left arm numbness in February 1999 was as symptom of cervical radiculopathy, as opposed to MS:

> Although the possibility of a cervical radiculopathy was raised in the past as the cause of her left arm symptoms, her cervical MRI scan in November of 1997 showed only disc bulges without evidence of nerve root compression. Disc bulges are common in the general population and generally not considered pathologic. No evidence of nerve root compression was seen. Her subsequent cervical MRI scan showed no significant evidence of discogenic or other degenerative abnormalities which would cause the diffuse left arm numbness from the shoulder down to the tips of the fingers. Demyelinating plaques were seen that would explain her left arm sensory symptoms. Although evidence of a median neuropathy at the wrist (carpal tunnel syndrom) was seen on nerve conduction study, this is likely an incidental finding and would not correlate with the diffuse numbness affecting the entire left upper limb, which also spread to affect the lower extremities. The EMG performed in May of 1999 did show evidence of denervation at C5 and 6 but this is consistent with multiple sclerosis affecting the cervical spinal cord and does not necessarily imply a nerve root compression.

Ex. GG at HLI000049. After reviewing the records of Dr. DiGregorio, Dr. Markowitz, and Dr. Matarese, Dr. Mercer concluded that "the records indicate that Ms. McLeod was treated on 2/22/99 for left arm numbness, which was a symptom and manifestation of her multiple sclerosis, albeit not yet diagnosed at that time." *Id.* at HLI000050. Finally, Plaintiff has not countered this theory with any medical opinion concluding that a link exists between her left arm numbness and cervical radiculopathy, as opposed to her MS. On this record, it was reasonable for Hartford to conclude that Plaintiff's left arm symptoms were attributable to her MS, as opposed to some other condition.

Based on this record evidence, Defendant contends that Hartford reasonably concluded that (1) Plaintiff began experiencing manifestations or symptoms of MS not later than 1998; (2) she received medical care for a symptom of MS on February 22, 1999 from Dr. DiGregorio; and (3) there was not a ninety day period after that during which she was treatment free. In light of these conclusions, Defendant argues, it was reasonable for Hartford to deny Plaintiff's claim for long term benefits. This Court agrees. Plaintiff offers several arguments in opposition, none of which are persuasive.[8]

Plaintiff's primary argument in opposition to Defendant's Motion for Summary Judgment is that Hartford could not conclude that Plaintiff received medical treatment for MS in February 1999 if the condition had not been diagnosed as MS at that time. *See* Plaintiff's Motion for Summary Judgment at 18–22. This argument ignores the plain language of the Plan. The Plan expressly excludes from coverage any claim for a disability that is "due to, contributed to by, or results from a Preexisting Condition." Ex. A at HLI000621. The Plan defines "Pre-existing Condition"

---

**8.** Plaintiff asked this Court to permit her Motion for Summary Judgment to also serve as her response to Defendant's Motion for Summary Judgment. *See* Plaintiff's Reply Mem. of Law at 1 [Doc. # 19]. Accordingly, Plaintiff's counterarguments are drawn primarily from her Motion for Summary Judgment.

to embrace "any *manifestations, symptoms,* findings, or aggravations *related to or resulting from* ... *a sickness* ... for which you received Medical Care" during the look-back period. *Id.* at HLI000622 (emphasis supplied).

The Plan does not require that a participant's disabling condition be *diagnosed* within the look-back period in order for it to be considered a "Pre-existing Condition"; rather, it merely requires that a participant receive medical care for a *symptom* or *manifestation* of the condition during the look-back period. Based on the administrative record, it was eminently reasonable for Hartford to conclude that when Plaintiff sought treatment from Dr. DiGregorio for numbness in her left side in February 1999, Plaintiff sought treatment for a "manifestation" or "symptom" of her MS, and that Dr. DiGregorio provided Plaintiff with medical care for that manifestation or symptom during the look-back period.

Plaintiff contends that a physician's report submitted in support of her appeal contradicts the evidence cited above, and demonstrates that Hartford's decision was arbitrary and capricious. In a February 5, 2001 letter to Plaintiff's counsel, Dr. DiGregorio explained that when she evaluated Plaintiff on February 22, 1999, she concluded that Plaintiff's numbness was related to an earlier diagnosis of cervical disc pathology. *See* Ex. DD at HLI000078. She also stated that Plaintiff was not "evaluated, diagnosed, or treated for" MS until August 1999, and that a definitive diagnosis was not made until April 2000. *Id.* at HLI000078 HLI000079. However, as Defendant points out, Dr. DiGregorio does not deny treating Plaintiff for left arm numbness in February 1999, nor does she deny that Plaintiff may have had MS in February 1999. In fact, when Dr. Mercer spoke to Dr. DiGregorio in May 2001, Dr. DiGregorio admitted that Plaintiff's left arm numbness in February 1999 could have been related to Plaintiff's MS. *See* Ex. HH, Letter from Dr. Mercer to Dr. DiGregorio, dated May 31, 2001. Accordingly, Dr. DiGregorio's February 5, 2001 letter is not inconsistent with Hartford's conclusion that when Plaintiff sought treatment for left arm numbness in February 1999, such treatment was rendered for a symptom of MS, albeit not yet diagnosed at that time.

Without citation to any legal authority, Plaintiff next contends that Defendant bears the burden of demonstrating that the symptoms experienced by Plaintiff are the result of her MS, and not some other condition. *See* Plaintiff's Motion at 15. This proposition is inconsistent with the applicable standard of review. As explained above in Part III, the Court's analysis is limited to determining whether Hartford's decision was reasonable in light of the Plan. *See Dewitt,* 106 F.3d at 520 ("We must uphold a plan interpretation even if we disagree with it, so long as the administrator's interpretation is rationally related to a valid plan purpose and is not contrary to the plain language of the plan."). Defendant bears no such burden, and Plaintiff's argument is without merit.

■ Plaintiff next argues that the Court should find Hartford's decision to be arbitrary and capricious because it initially granted Plaintiff's application for short term disability benefits, but then denied her application for long term benefits without any new evidence or apparent change in Plaintiff's circumstances. However, Hartford explained in its letter extending Plaintiff's short term benefits that "receipt of Short Term Disability benefits does not necessarily mean that you will be eligible to receive Long Term Disability benefits." Ex. X, Letter from Hartford to Plaintiff, dated May 3, 2000. The Court cannot conclude that Hartford's subsequent denial of benefits was unreasonable based on this

inconsistency alone, especially when Hartford communicated this possibility to Plaintiff.

Finally, Plaintiff calls the Court's attention to case law that she erroneously believes supports her position. She firsts cites Senior Judge Newcomer's decision in *Holzschuh v. UNUM Life Insurance Co. of America*, No. Civ.A. 02–1035, 2002 WL 1609983 (E.D.Pa. July 18, 2002). In *Holzschuh*, the court considered a claim for wrongful termination of benefits in violation of ERISA § 1132(a)(1)(B). After concluding that it should review the administrator's decision under a heightened arbitrary and capricious standard, the court examined evidence of the administrator's conflict of interest in order to determine where the case should fall on *Pinto*'s sliding scale. *See id.* at *6. The court concluded that evidence of procedural anomalies in the administrative review process warranted "significant skepticism" and little deference to the administrator's decision to deny benefits. *Id.* at *6. First, the administrator initially awarded long term disability benefits, but later reversed its position based on a conclusion that Judge Newcomer found to be "simply wrong" in light of the record. *Id.* Second, the court found that the administrator failed to squarely confront medical evidence that supported plaintiff's claim for benefits. *See id.* Third, the court found it "very troubling" that the administrator had relied on medical reports prepared by non-treating nurses and physicians to deny plaintiff's claim for benefits, while arbitrarily rejecting a report of a treating physician. *Id.* at *7.

In reviewing the administrator's decision to deny benefits, the court found that the administrator had selectively relied upon only those parts of plaintiff's medical records that were adverse to plaintiff's claim, while ignoring objective medical evidence and the "unwavering" supportive conclusions of Plaintiff's treating physicians. *Id.* at *8. As such, the court found that the administrator had acted more like an adversary, rather than an impartial judge of plaintiff's claim for benefits, and reversed the denial of benefits as arbitrary and capricious. *See id.* at *8–9.

*Holzschuh* is distinguishable from the instant matter, and thus provides no support for Plaintiff. First, the court in *Holzschuh* applied the *heightened* arbitrary and capricious standard of review, whereas this case necessitates more deferential scrutiny. *See* Part III, *supra.* Second, as explained above, Hartford looked to Plaintiff's treating physicians (Drs. DiGregorio, Matarese, and Markowitz) first and foremost in rejecting her claim, and only later relied on a non-treating physician, Dr. Mercer, to review Plaintiff's medical file and provide an additional opinion for purposes of Plaintiff's appeal.

Third, none of the procedural anomalies identified in *Holzschuh* are present here. Although Hartford did reverse its initial decision to award benefits, it did so after collecting and reviewing additional medical evidence, all of which supported application of the pre-existing condition limitation. Unlike *Holzschuh*, the Court cannot conclude on this record that Hartford reversed its position based on a conclusion that is "simply wrong," or that it failed to confront contrary medical evidence. *Id.* at *6. Hartford has the authority to determine eligibility for benefits, and this function "must encompass the resolution of factual disputes as well as the interpretation of the governing provisions of the Plan." *Mitchell*, 113 F.3d at 439. Any evidence that might be construed as supportive of Plaintiff's position was analyzed and rejected by both Dr. Mercer and Hartford. As explained above, the Court finds that Hartford's conclusion was reasonable and adequately supported by the record.

The other case relied upon by Plaintiff is the Third Circuit's decision in *Lawson v. Fortis Insurance Co.*, 301 F.3d 159 (3d Cir.2002). *Lawson* involved a breach of contract action against an insurer for wrongful denial of benefits under an insurance policy not governed by ERISA. Two days before the policy at issue took effect, a child covered under the policy received medical treatment for what was originally diagnosed as a respiratory tract infection, but which was discovered to be leukemia one week later, after the effective date of the policy. The insurer denied coverage for medical expenses related to leukemia on the ground that it was a pre-existing condition for which the child had received treatment before the effective date of the policy, and thus excluded under the policy. *See id.* at 160. The district court granted summary judgment against the insurer, and the Third Circuit affirmed. The court rejected the insurer's argument that the pre-existing condition language of the policy did not require accurate diagnosis of the condition, but merely receipt of treatment for the symptoms of it. *See id.*

The insurer in *Lawson* presented the same argument that Hartford advances here; however, the insurance policy language in *Lawson* differed from the Hartford policy language, and the difference is critical. In *Lawson* the policy defined a pre-existing condition as "Sickness, Injury, disease or physical condition for which medical advice or treatment was recommended by a Physician or received from a Physician" during a five year look-back period. *Id.* at 161. The court examined whether receiving treatment for symptoms of an unsuspected or misdiagnosed condition prior to the effective date of coverage makes the condition a pre-existing condition under the policy, and the court concluded that the contract terms were ambiguous on this point. *See id.* at 165. Following the rule of *contra proferentem* and construing ambiguous terms against the insurer, the court found that before the effective date of the policy the child received treatment "for" what were initially diagnosed as symptoms of a respiratory tract infection, and not "for" leukemia. *See id.* Basing its decision on the language of the policy,[9] the court concluded

---

9. The Third Circuit expressly based its decision on the language of the policy, but it also included some cautionary comments that bear mentioning here:

> [W]e note that considering treatment for symptoms of a *not-yet-diagnosed condition* as equivalent to treatment of the underlying condition ultimately diagnosed might open the door for insurance companies to deny coverage for any condition the symptoms of which were treated during the exclusionary period. "To permit such backward-looking reinterpretation of symptoms to support claims denials would so greatly expand the definition of preexisting condition as to make that term meaningless: any prior symptom not inconsistent with the ultimate diagnosis would provide a basis for denial.".... In *Raniel v. Mutual Life Insurance Company of America*, ... the Pennsylvania Superior Court held that recovery under a pre-existing condition clause was "condi-

tioned on the fact that prior to the stipulated date, the sickness was not manifest, nor could it have been diagnosed with reasonable certainty by one learned in medicine.".... The court found such a policy to be "reasonable and salutary" because "[t]o deny coverage because of an incipient disease that has not made itself manifest ... is to set an unconscionable trap for the unwary insured."

*Lawson*, 301 F.3d at 166 (internal citations omitted). Here, Hartford's insurance policy expressly permits it to deny coverage based only on symptoms of an undiagnosed sickness, and thus allows it to rely on a "backward-looking reinterpretation" when denying benefits. Plaintiff's memoranda are replete with vitriol and hyperbole, urging upon the Court her view that this is unfair. This Court is not unsympathetic to Plaintiff's unfortunate circumstances, but the Court's role is constrained by the applicable standard of review,

that the child did not have a sickness "for which medical advice or treatment was recommended by a Physician" during the look-back period. *See id.* at 166.

Unlike the policy in *Lawson,* the Plan in this case excludes pre-existing conditions, which is defined to include the situation where a claimant receives treatment for "symptoms" and "manifestations." *See* Ex. A at HLI000622. Accordingly, the central question at issue in *Lawson, i.e.,* "whether it is possible to receive treatment 'for' a condition without knowing what the condition is," does not present itself in this case. *Lawson,* 301 F.3d at 162. Rather, the primary question presented here is whether Plaintiff received treatment "for" any "manifestations" or "symptoms" of MS during the look-back period. As explained above, Hartford concluded that she did,

and the Court finds Hartford's conclusion is reasonable and supported by the administrative record.[10]

Accordingly, summary judgment is granted in favor of Defendant, and Plaintiff's Motion for Summary Judgment is denied. An appropriate Order follows.

### ORDER

AND NOW, this 27th day of February, 2003, upon consideration of Defendant's Motion for Summary Judgment [Doc. # 16], Plaintiff's Motion for Summary Judgment [Doc. # 14], Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment [Doc. # 18], Plaintiff's Reply Memorandum of Law [Doc. # 19], Defendant's Supplemental Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment [Doc.

and its requisite deference to the administrator. As explained above, Hartford's decision was reasonable in light of the Plan language, and thus Plaintiff's cause of action for wrongful denial of benefits must fail. Although it is surely of no consolation to this Plaintiff, the Third Circuit has suggested that the insurance marketplace, rather than the courts, will be final arbiter of fairness in these circumstances. *See Pinto,* 214 F.3d at 388 ("We do not denigrate the Seventh Circuit's suggestion that if a carrier ... became notoriously unfriendly to claimants, unions and employees might protest and demand that their employer switch to a different insurance plan.... An insurance company can hardly sell policies if it is too severe in administering them.") (internal quotes and citations omitted).

10. Factual distinctions aside, *Lawson* is probably not controlling in this case. The policy in *Lawson* was not governed by ERISA, and thus it rests on analytical grounds that do not always adhere in the ERISA context. The *Lawson* court relied in part on *contra proferentem,* a principle of contract construction. The Third Circuit has applied this principle in ERISA cases, but only to decide whether a plan granted discretion to the plan administrator. *See Heasley v. Belden & Blake Corp.,* 2 F.3d 1249, 1257–58 (3d Cir.1993). Although the Third Circuit has not addressed whether

*contra proferentem* may be applied where, as here, the plan administrator has discretion to interpret the terms of the plan and the standard of review is arbitrary and capricious, other courts have concluded that the doctrine is inapplicable in those circumstances. *See, e.g., Kimber v. Thiokol Corp.,* 196 F.3d 1092, 1100–01 (10th Cir.1999). In doing so, these courts recognize that the arbitrary and capricious standard requires deference to the administrator, which demands "a more abstract inquiry—the construction of someone else's construction." *Id.* at 1101 (quoting *Morton v. Smith,* 91 F.3d 867, 871 n. 1 (7th Cir.1996)). In deciding this case, the Court is mindful of its limited scope of review, a constraining factor not present in *Lawson.* In the matter *sub judice,* the Court may only reverse an unreasonable denial of benefits, and it is not free to construe the terms of the Plan for or against either party. *See, e.g., Smathers,* 298 F.3d at 199 ("'[A] plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan. A court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.") (quoting *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.,* 222 F.3d 123, 129 (3d Cir.2000)).

# 20], and Plaintiff's Sur Reply Memorandum of Law [Doc. # 21], it is hereby ORDERED that Defendant's Motion is GRANTED. It is further ORDERED:

1. Plaintiff's Motion for Summary Judgment is DENIED;

2. Judgment as to Count II of the Complaint is hereby entered in favor of Defendant Hartford Life and Accident Insurance Company;

3. The Clerk of Courts is hereby directed to mark this case closed for administrative purposes.