Maxine **FAHRINGER**, Plaintiff,

v.

The **PAUL REVERE INSURANCE COMPANY, Unum Provident Corporation, and Atlanticare Health System Group Long Term Disability Plan, Defendants.**

No. CIV.A.00–5134.

United States District Court, D. New Jersey.

Dec. 2, 2003.

Uri H. Taenzer, Taenzer, Friedman, Ettenson & Stockton, Moorestown, NJ, for Plaintiff/Counter Defendant.

Kristin J. Telsey, Earp Cohn P.C., Cherry Hill, NJ, for Defendants/Counter Claimant.

## ORDER

RODRIGUEZ, District Judge.

This matter has come before the Court on motion of Defendants The Paul Revere Insurance Company, Unum Provident Corporation, and the Atlanticare Health System Group Long Term Disability Plan for summary judgment in their favor and against Plaintiff on Plaintiff's Complaint, and for summary judgment in their favor on the counterclaim. Plaintiff has cross-moved for summary judgment.

## BACKGROUND

Plaintiff Maxine Fahringer, a registered nurse, was employed by Atlantic City Medical Center/Atlanticare Health System ("Atlanticare"). Atlanticare provided its employees with a group long term disability plan ("Plan") through a contract with the Paul Revere Insurance Company ("Paul Revere"). On July 4, 1996, Fahringer sustained a back injury when she moved a trash can while on duty at Atlanticare. On October 22, 1996, Fahringer filed a claim for long term disability insurance benefits through the Paul Revere Plan.

The Plan defined "total disability" for the first 104 weeks of disability as "the complete inability of the individual to perform the substantial and material duties of his or her occupation." (Admin. Rec. at 552.) At the expiration of the two-year period, the Plan defined "total disability" as "the complete inability of the individual to engage in any and every occupation for a salary, wage or profit for which he or she is or become[s] reasonably qualified by training, education or experience." (Id.) The Plan also provided for an offset of monthly disability benefits upon the insured's receipt of "other income benefits," which included benefits under the Social Security Act.

Paul Revere approved Fahringer's claim and commenced monthly disability benefit payments on March 21, 1997. Fahringer was to receive monthly benefits in the amount of $2,298.11, retroactive to January 1, 1997. On November 2, 1998, Fahringer began to receive monthly disability benefits from the Social Security Administration ("SSA") in the amount of $1,196 per month, retroactive to January 1, 1997.

Beginning November 9, 1998, Fahringer also received Social Security benefits in the amount of $199 per month for each of her three children, retroactive to January 1, 1997.

Paul Revere was notified that Fahringer was receiving Social Security benefits, and, pursuant to the terms of the Plan, on December 11, 1998 and January 18, 1999, Paul Revere requested from Fahringer reimbursement for its overpayment in the amount of $37,477.33. On January 20, 1999, Fahringer formally appealed Paul Revere's decision to offset her monthly benefit amount under the Plan by the amount received from the SSA. On March 8, 1999, Paul Revere denied Fahringer's appeal based on the "other income benefits" offset provision in the Plan.

In a separate letter, on March 8, 1999, Paul Revere notified Fahringer that she was not entitled to future disability benefits. Paul Revere determined that, as of January 1, 1999, which was the end of Fahringer's two-year "her occupation" disability period, she was not totally disabled as defined by the "any occupation" provision. Fahringer appealed Paul Revere's decision to terminate her benefits multiple times, and Paul Revere denied each of her appeals.

Fahringer filed a Complaint in New Jersey state court seeking benefits due to her under the Plan. Defendants removed the action to this Court and filed a counterclaim against Fahringer to recover reimbursement for Paul Revere's overpayment to Fahringer. The action was stayed to allow Fahringer to exhaust her administrative remedies by obtaining a final administrative review of her claim by Atlanticare. On August 21, 2002, Fahringer's final appeal was denied. Defendants now move for summary judgment in their favor and against Fahringer on Fahringer's Complaint, and for summary judgment in their

favor on the counterclaim. Fahringer also cross-moves for summary judgment.

## DISCUSSION

### A. Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n. 1 (3d Cir.2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *accord* Fed.R.Civ.P. 56(c). Thus, a court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

### B. Standard of Review Under ERISA

ERISA provides that a plan participant or beneficiary may bring a suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). ERISA, however, does not specify a standard of review for an action brought under § 1132(a)(1)(B). *See Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437 (3d Cir.1997). The Supreme Court addressed the issue and determined that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

Where the plan affords the administrator discretionary authority, a district court's grant of summary judgment is made under an arbitrary and capricious standard. *See Nazay v. Miller*, 949 F.2d 1323, 1334 (3d Cir.1991); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 119 (3d Cir. 1990). Under this standard of review, an administrator's decision must be affirmed unless it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya v. Hoffmann–LaRoche, Inc.*, 2 F.3d 40, 45 (3d Cir.1993) (quotations and citations omitted). A court is not free to substitute its own judgment for that of the administrator's in determining eligibility for plan benefits. *Id.* (citations omitted).

A heightened standard of review is required, however, when the structure of the ERISA plan presents a conflict of interest. *See Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 383 (3d Cir. 2000). Where a plan fiduciary acts under a conflict of interest in making an eligibility for benefits decision, that decision is reviewed on a "sliding scale." *Id.* at 392. This sliding scale approach is deferential, but not absolutely deferential, and allows each case to be examined on its facts. *Id.* A court may consider "the nature and degree of apparent conflicts with a view to shaping [its] arbitrary and capricious review of the benefits determinations of discretionary decisionmakers." *Id.* at 393.

## C. Which Standard of Review Applies to the Plan

In deciding whether Paul Revere properly denied Fahringer's claim, it first must be determined which standard of review applies-de novo, arbitrary and capricious, or the heightened arbitrary and capricious standard. To make this determination, two factors are considered: 1) whether the Plan gives the administrator discretionary authority to determine eligi-

bility for benefits or to construe the terms of the Plan; and, 2) whether there is a conflict of interest.

## 1. The Plan Grants Administrators Discretionary Authority

Whether a plan grants an administrator discretionary authority to determine eligibility for benefits depends on the terms of the plan. *See Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 114 (3d Cir.1994); *Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176, 1180 (3d Cir.1991). In instances where a plan has been revised during an insured's policy period, the applicable plan is the one in effect on the date the administrator actually made the benefits determination. *Smathers v. Multi–Tool, Inc./Multi–Plastics, Inc. Employee Health & Welfare Plan*, 298 F.3d 191, 196 (3d Cir.2002).

Here, because the Plan was revised during the effective dates of Fahringer's policy, there is debate as to which Plan's language is applicable to determining whether Paul Revere has discretionary authority. Paul Revere made its initial benefits decision concerning Fahringer's application for long term disability benefits on or before March 21, 1997. (*See* Admin. Rec. at 1026–27.) The amended Plan did not take effect until June, 1997. (*See id.* at 502.) Thus, the applicable Plan to Paul Revere's initial benefits decision is the one prior to the amendment.

Paul Revere's subsequent benefits decisions did not occur until after January, 1999, however, which is after the effective date of the amended Plan. The amended Plan explicitly grants the administrator discretionary authority to determine eligibility for benefits. The Plan states, in relevant part: "The Plan Administrator will be the sole judge of the application and interpretation of the Plans, and will

have the discretionary authority to construe the provisions of the Plans, to resolve disputed issues of fact, and to make determinations regarding eligibility for benefits." (*Id.* at 542.) Thus, it is clear that the Plan grants its administrator discretionary authority to determine eligibility for benefits and to construe the terms of the plan.[1]

## 2. The Plan Does Not Present a Conflict of Interest

An employer typically structures an ERISA plan's administration, interpretation, and funding in one of three ways:

> First, the employer may fund a plan and pay an independent third party to interpret the plan and make plan benefits determinations. Second, the employer may establish a plan, ensure its liquidity, and create an internal benefits committee vested with the discretion to interpret the plan's terms and administer benefits. Third, the employer may pay an independent insurance company to fund, interpret, and administer a plan.

*Pinto*, 214 F.3d at 383.

Only the third type of ERISA plan structure constitutes a conflict of interest. *See id.* A conflict arises in "the insurance company-as-funder-and-administrator context [because] the fund from which monies are paid is the same fund from which the insurance company reaps its profits." *Id.* at 378. As a result, this type of insurance company has "an active incentive to deny close claims to keep costs down" and increase profits. *Id.* at 388. The other two Plan structures do not typically constitute a conflict of interest. *Id.* at 383.

Fahringer's Plan is the first structure type. Atlanticare funds the Plan and pays Paul Revere, an independent third party, to administer the Plan. (Def. Reply at 4; Admin. Rec. at 509.) Paul Revere does not profit from the same fund from which insurance claims are paid. Therefore, Paul Revere was not acting under a conflict of interest when it made its benefits determinations concerning Fahringer's claims.

## D. Review of Paul Revere's Benefits Decision—*(PART I)*

The arbitrary and capricious standard of review will be applied to Paul Revere's benefits decisions because the Plan grants discretionary authority to its administrator and does not present a conflict of interest. In reviewing an administrator's benefits decision under the arbitrary and capricious standard, a court is not free to substitute its own judgment for that of the benefits administrator's judgment in determining eligibility for plan benefits. *See Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir.1997). Instead, a court must review the same record the administrator considered when making the decision to deny benefits. *Id.* The relevant record a court must review consists of the evidence that was before the administrator at the time of the final denial. *Id.*

---

1. Even if the pre-June 1997 Plan applied to the post-January 1999 benefits decisions, the pre-June 1997 Plan impliedly granted its administrator discretionary authority to determine eligibility for benefits through the use of the phrase "satisfactory proof, as determined by National Risk Management, Inc." (Admin. Rec. at 550). "Discretionary powers may be implied by a plan's terms even if not granted expressly." *Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176, 1180 (3d Cir.1991); *see also Russell v. Paul Revere Insurance Co.*, 148 F.Supp.2d 392, 400–01 (D.Del.2001), *aff'd*, 288 F.3d 78 (3d Cir.2002) (stating that "language requiring 'satisfactory proof' often implies an inference of discretion on the part of the plan administrator").

### 1. What Constitutes the Relevant Record

■ Paul Revere and Fahringer dispute the content of the relevant record. Fahringer contends that the relevant record consists of all the evidence in the administrative record as of Paul Revere's final denial of Fahringer's claim on August 21, 2002. Paul Revere argues that even though the administrative record contains all evidence submitted as of August 21, 2002, the relevant record consists only of the evidence pertaining to Paul Revere's 1999 denial of benefits under the "any occupation" definition of total disability and its request for reimbursement for the offset of Fahringer's Social Security benefits.

Paul Revere is correct. For the first two years of Fahringer's disability, in order to receive long term disability benefits, Fahringer's condition had to constitute a "complete inability . . . to perform the substantial and material duties of . . . her occupation." (Admin. Rec. at 552.) After that two-year period, which was January 1, 1999 in Fahringer's case, in order to continue receiving long term disability benefits, Fahringer's condition had to constitute a "complete inability . . . to engage in any and every occupation for a salary, wage or profit for which . . . she is or become[s] reasonably qualified by training, education or experience." (*Id.*) If Fahringer did not meet the "any occupation" total disability definition as of January 1, 1999, her disability benefits would be terminated and she would be required to return to work.

■ Thus, the critical inquiry is whether Paul Revere was arbitrary and capricious in determining that Fahringer's condition as of January 1, 1999 did not satisfy the definition of total disability from "any/occupation." Accordingly, the relevant record consists of all evidence considered by Paul Revere and Atlanticare in their appeals decisions concerning Fahringer's condition as of January 1, 1999. Although any evidence obtained before Paul Revere's final denial of benefits on August 21, 2002 is potentially admissible, only the evidence pertaining to Fahringer's condition as of January 1, 1999 can be considered. Therefore, the relevant record that must be reviewed under the arbitrary and capricious standard is all evidence obtained prior to August 21, 2002 that concerns Fahringer's condition as of January 1, 1999.[2]

### 2. Summary of the Record

In a letter dated July 17, 1998, Paul Revere reminded Fahringer that the Plan definition of "total disability" would be changing as of January 1, 1999. (Admin. Rec. at 1144.) In order to determine whether Fahringer would be disabled from "any occupation" as of January 1, 1999, Paul Revere informed Fahringer that a case worker from Genex, an investigative company used by Paul Revere to assist in determining eligibility for claimants (Def. Statement of Facts ¶ 20), would be visiting Fahringer and interviewing Fahringer's physicians (Admin. Rec. at 1171). On July 27, 1998, the Genex case worker visited

---

**2.** On August 21, 2001, Magistrate Judge Robert B. Kugler granted Fahringer's discovery request to depose Nancy Mello, a Paul Revere claims examiner, and John Bianchi, M.D., a medical consultant and employee of Defendants. (Admin. Rec. at 961–65.) Judge Kugler limited the scope of this discovery, however. Mello was only to be asked about the contents and interpretation of the record, procedures followed, and any conflicts of interest. (*Id.* at 966.) Dr. Bianchi was only to be asked about what information he conveyed to the decision-maker. (*Id.*) Because these depositions pertain to Paul Revere's determination that Fahringer was not totally disabled from "any occupation" as of January 1, 1999, they are part of the relevant record.

Fahringer's home and interviewed her concerning her current condition. (*Id.*) The case worker prepared a detailed report of the interview, and provided a summary at the conclusion of the report:

> The insured presented amicably, and offered information cooperatively throughout our interview. She maintained that she is totally disabled from any occupation, and that certain treatment recommendations, such as surgery, physical therapy, and a QST, are difficult for her to pursue at this time for various reasons.
>
> She indicated that she mourns the loss of her career, which she loved and would return to it if she was physically able. She added that she fears the termination of her LTD benefits due to her age and the disbelief that someone her age could really be unable to work at all. In light of this and her tight finances, she has given serious thought to other employment options, which she has been forced to disqualify, due to an array of physical symptoms, and her perception of her inability to perform any task without serious pain and difficulty.

(*Id.* at 1186.) The case worker concluded by stating that she would submit a follow-up report after reviewing Fahringer's medical records and speaking with her doctors. (*Id.*)

On September 21, 1998, the Social Security Administration approved Fahringer's claim for Social Security benefits. (*Id.* at 1321.) The decision states, "Based upon claimant's residual functional capacity, and vocational factors, it is not reasonable to expect there are jobs existing in significant numbers which she can perform." (*Id.* at 1328.) SSA's determination that Fahringer was totally disabled was based on the definition of disability as defined by the Social Security Act. (*Id.*)

On September 28, 1998, the Genex case worker spoke to one of Fahringer's physi-

cians, Stephen J. Hefferen, M.D. (*Id.* at 1207.) The report states, "Dr. Hefferen advised that, from a medical standpoint, the insured is not expected to 'get much better' and will remain totally disabled from nursing, which is why he stated on his AP statement that the insured could never return to work. However, he maintained that she could probably do something of a sedentary nature, but that he would 'leave that up to Diane Dimaio–Feldman'[a neuropsychologist Dr. Hefferen advised Fahringer to see for a battery of vocational tests geared towards vocational rehabilitation]." (*Id.* at 1222–23.) Dr. Hefferen did not know whether Fahringer followed this recommendation. (*Id.* at 1222.)

On October 4, 1998, Perry Black, M.D. performed surgery, a lumbar laminectomy and discectomy at L3–4, on Fahringer because she had increasing pain in her low back and lower extremities, as well as difficulty fully voiding her bladder. (*Id.* at 1308, 1312.) On October 22, 1998, Fahringer called Dr. Black to report that over the past weekend, she had "a lot (sic) of pain in low back 'in spurts' with back spasms." (*Id.* 1317.) Dr. Black informed Fahringer that intermittent pain after major back surgery was common, but he referred her for an MRI "to be sure." (*Id.*) During their conversation, Fahringer reported that "overall, her pain is better since her back surgery, ... pain [in her] left leg and numbness have improved ... [and she has] [n]o problem with [her] bladder." (*Id.*)

On March 8, 1999, Nancy Mello, claims examiner for Paul Revere, informed Fahringer that she did not meet the Plan definition of "total disability" from "any occupation." (*Id.* at 1262.) The explanation for Paul Revere's decision relied heavily on the Genex case worker's report of her teleconference with Dr. Hefferen.

Based on that report, because Dr. Hefferen stated that Fahringer "could do a sedentary occupation with the flexibility of sitting and standing as needed," Mello explained that "it appears you are qualified and have many skills which are transferable, based on your prior work experience, to do quality assurance, disability case management or file reviews." (*Id.*) This denial letter does not indicate whether Paul Revere reviewed medical information from Dr. Black.

On June 1, 1999, Fahringer's attorney formally appealed Paul Revere's benefits denial. (*Id.* at 1293.) In his letter to Paul Revere, he challenged Paul Revere's reliance on Dr. Hefferen's comment that Fahringer "could probably 'do something of a sedentary nature,'" and asserted that Dr. Hefferen "did not at any time intend to suggest that the claimant . . . is able to engage in 'any and every occupation for a salary, wage or profit for which she is or becomes reasonably qualified by training, education or experience.'" (*Id.*) Counsel also pointed out that two days after the Genex case worker's teleconference with Dr. Hefferen, Fahringer was admitted to the hospital for back surgery. (*Id.* at 1295.) Additionally, Counsel included the benefits decision by the SSA. (*Id.* at 1298–99.)

In a follow-up letter on June 3, 1999, Counsel provided Paul Revere with additional medical records from Dr. Hefferen's examination of Fahringer. On March 10, 1999, Dr. Hefferen reported that Fahringer was "doing quite a bit better" since the surgery, and that she "has a lot less pain." (*Id.* at 1331.) Dr. Hefferen added that "her hands bilaterally are bothering her now, and the palms or her hands secondary to her brachial plexus stretch injury. . . . She remains on Advil 800 mg. PRN for severe back pain, Zanaflex PRN for muscle spasm, and Zantac to protect her stomach." (*Id.*) On May 19, 1999, Dr.

Hefferen reported that Fahringer had been doing better after surgery, but was now "tripping over her feet now and then," and "she has burning in the first 3 fingers of her hands bilaterally, pain in her hands bilaterally, and intermittent paresthesias, dysesthesias, etc. of the hands." (*Id.*) Dr. Hefferen added, "At this point I think she really is unable to do any work that I can think of of almost any kind. I don't even think she can do sedentary work at this point because she has pain all over, but especially her hands." (*Id.*)

At Paul Revere's request, on August 2, 1999, Michael Theerman, M.D. performed a medical review of Fahringer's file. (*Id.* at 1343.) Dr. Theerman reviewed all the materials received since his last review and stated,

At that time, it was noted that the insured's physician felt she was capable of some type of work, so the file was closed. Now it seems that her doctors are of the opinion that there is almost no job which could accomodate (sic) her myriad of problems. It should be noted that the insured underwent an L3/4 diskectomy on 10-4-98, with improvement in her low back pain, but still complains of some discomfort there, as well as upper extremity symptoms. I believe it may be difficult to refute the insured's allegations in view of her previously-demonstrated disc and brachial plexus conditions. However, it may be useful to obtain surveillance to see if her alleged impairments are consistent with her usual daily activities.

(*Id.*)

Video surveillance was conducted on Fahringer on September 16, 17, and 18, 1999. (*Id.* 1348; Surveillance Video) Paul Revere requested Dr. Theerman to review the video surveillance to determine whether the "medical records and the results from the activities check support an im-

pairment that would preclude Ms. Fahringer from returning to work in any occupation." (Admin. Rec. at 1362.) Dr. Theerman stated,

> The insured in the past had some low back pain and arm difficulties. However, the videotape shows her spending a full day of more than 12 hours out and about, doing errands, going to lunch and dinner, walking, bending, lifting her daughter, reaching into the back seat of her vehicle from the front, carrying groceries, and even apparently working 4 hours at a bingo parlor then going to the bank to deposit the receipts. It is obvious that she has no serious impairment which would preclude the duties of a sedentary or light work occupation.

(Id.)

Video surveillance was conducted again on October 28, 29, and 30, 1999. (Id. at 1388.) This video surveillance shows the same type of activity as the previous surveillance. (See Surveillance Video.) Mello requested a rehabilitation review, and the reviewer, Penny (no last name provided), stated in her December 20, 1999 response,

> Clearly this claimant is able to maintain a busy schedule. She is able to drive, carry light objects, walk, read, talk, and interact. Given her education and experience, it would seem that she could do quality assurance case management, utilization review, and home health management. She could also do medical teaching, office nursing, insurance case management.

(Admin. Rec. at 1401.) The job descriptions for these alternative occupations were included in Fahringer's case file. (Id. at 1402–10.)

On December 27, 1999, Paul Revere again determined that Fahringer was not totally disabled from "any occupation." (Id.) In a letter to Fahringer's attorney, Paul Revere stated that in making its determination, it considered "a copy of Alle-

gheny University Hospital Medial [Dr. Black's] records dated October 3, 1998 through October 22, 1998; a copy of the Social Security Award Decision dated September 21, 1998; as well as copies of office notes of Stephen J. Hefferen, M.D. for March 10, 1999, May 12, 1999 and May 19, 1999." (Id.)

The denial letter further explains that although in May 19, 1999 Dr. Hefferen stated that Fahringer was unable to do any work that he could think of, "[o]n the Attending Physician Statement signed by Dr. Hefferen on August 12, 1998, he indicated he did not consider Ms. Fahringer Totally Disabled from Any Other Work." (Id. at 1422.) The letter also details Fahringer's activities in the video surveillance. Considering all this information, Paul Revere determined that there was insufficient evidence to support an impairment that would preclude Fahringer from performing the duties of "any occupation." (Id. at 1423.)

Fahringer appealed the denial for a third time, and, on February 22, 2000, provided additional documentation for consideration. (Id. at 1432.) Included in this additional information were records concerning another surgery performed by Dr. Black on January 7, 2000. The operative notes state, "The patient is a 38–year–old female who had a fall in 1998 with urgent L3–L4 lumbar discectomy for extrusion and herniated disc .... She did well, but in the past months there has been a recurrence of pain ...." (Id. at 1486.)

Yet another medical review of Fahringer's entire case file was performed by Dr. Theerman. (Id. at 1520.) In addition to summarizing his previous reviews, Dr. Theerman stated that as of October 1999, Fahringer was capable of sedentary or light work, but she may have injured her back in December, 1999 to require the January, 2000 surgery because it was in

December, 1999 when Fahringer "says the low back pain start[ed] worsening." (*Id.*) Dr. Theerman concluded that "there were many months prior to December of 1999 when she was capable of performing full-time sedentary or light work, and it is likely that she is now once more capable of doing so." (*Id.*)

On May 26, 2000, Paul Revere notified Fahringer that it again was denying her appeal. (*Id.* at 1566.) The denial letter listed eighteen additional documents considered since its previous denial, but none of the newly submitted information changed Paul Revere's determination that as of January 1, 1999 Fahringer was capable of working in some occupation. (*Id.* at 1566–72.) The same reasons for denial were again relayed to Fahringer on July 3, 2000 and July 10, 2000.

On June 10, 2002, Fahringer submitted a final formal appeal, which was summarily denied on August 21, 2002. (*Id.* at 361.)

### 3. Review of Paul Revere's Benefits Decision

█ Fahringer contends that Paul Revere acted arbitrarily and capriciously in denying her claim for long term disability benefits. Fahringer argues that Paul Revere discounted extensive medical evidence from 1999 through 2002 that demonstrates Fahringer's inability to work in "any occupation." Fahringer also argues that Paul Revere disregarded the Social Security Administration's determination that Fahringer is totally disabled.

Additionally, Fahringer challenges a medical review conducted by John Bianchi, M.D. on April 13, 2000 that was used as one basis for denying Fahringer's claim. The condition listed in the "diagnosis" box on the medical review request form was "brachial plexus traction injury." (Admin. Rec. at 1553.) Dr. Bianchi was asked, "Does it appear Ms. Fahringer was treated for her stated condition during the year prior to her January 7, 2000 surgery?" and "Is the diagnosis stated above in any way related to the surgical intervention of January 7, 2000?" (*Id.*) Dr. Bianchi answered that Fahringer was not actively treated for the stated condition of brachial plexopathy during the year prior to her January 7, 2000 surgery and that the stated diagnosis was not related to that surgery. (*Id.*)

Fahringer argues that these questions to Dr. Bianchi were misleading and allowed Dr. Bianchi to circumvent an opinion concerning Fahringer's primary condition because the questions referred him to the stated diagnosis of brachial plexus traction injury, which was not her primary disability and was not the condition for which surgery was performed. (*Id.* at 1667.) Fahringer also challenges the objectivity of Dr. Theerman, another Paul Revere medical consultant.

Conversely, Paul Revere argues that its decision to deny Fahringer continued benefits was not arbitrary and capricious. Paul Revere supports its position with the evidence submitted for consideration as it pertained to Fahringer's condition as of January 1, 1999. Paul Revere states that it was the opinion of Fahringer's treating physicians before the October, 1998 surgery that she could engage in light work, and that after the surgery, Fahringer, by her own admissions, was in better condition between December 1998 and May 1999.

Paul Revere further contends that once it determined that Fahringer was no longer disabled from "any occupation," she was obliged to return to work at Atlanticare in some capacity in order to retain her insurance coverage as an Atlanticare employee. Because she did not return to work, and because she did not qualify for benefits under the "any occupation" standard, Fahringer no longer had insurance coverage under the Atlanticare Plan.

Under the arbitrary and capricious standard of review, which is analogous to an abuse of discretion standard, Paul Revere's judgment cannot be substituted by the Court's own judgment regarding Fahringer's eligibility for benefits. After reviewing the relevant record, Paul Revere's decision may be overturned only if it was made without reason, unsupported by substantial evidence, or erroneous as a matter of law.

An insured's ability to satisfy the Plan's total disability from "any occupation" provision is extremely difficult. In order to continue receiving benefits after December 31, 1998, Fahringer was required to be completely unable to engage in any and every occupation for which she was or became reasonably qualified by training, education or experience. In other words, Fahringer had to return to work if there was some occupation for which she was qualified, or could have become qualified, unless she was completely unable to do so. Because Fahringer's education and experience provided her with the ability to work in occupations other than nursing, the issue was whether she was completely unable to engage in any of those other occupations.

Paul Revere determined that Fahringer's condition would permit her to engage in sedentary employment, such as quality assurance or disability case management. Paul Revere initially based its decision on the Genex case worker's conversation with Fahringer's physician, Dr. Hefferen, and a review of Fahringer's medical records from Dr. Hefferen and Dr. Schwartzman. Dr. Hefferen had last seen Fahringer on September 16, 1998 and had spoken to the case worker on September 28, 1999. (Admin. Rec. at 1223.)

Fahringer challenges Paul Revere's reliance on Dr. Hefferen's statement that she could "do something of a sedentary nature," because less than a week later, Fahringer underwent surgery. It is unclear from the record whether Paul Revere considered Fahringer's October 4, 1998 surgery when it issued its denial letter in March, 1999. The appeals process established by ERISA, however, permits an insured to appeal a negative benefits decision and supply additional information for review. Thus, Paul Revere's second review of Fahringer's claim considered the additional information submitted by Fahringer, which included the Social Security Administration's decision, medical records concerning Fahringer's October, 1998 surgery, and additional medical records from Dr. Hefferen and Dr. Black. Paul Revere also considered its own medical reviews by plan consultants, as well as the video surveillance of Fahringer.

The record that Paul Revere reviewed in denying Fahringer's appeal demonstrates that Paul Revere did not act without reason and its decision was supported by substantial evidence. Following the October, 1998 surgery, Fahringer's doctors reported that she responded well to the surgery. As of March 10, 1999, which was three months past the date the Plan's definition of "total disability" changed, Dr. Hefferen reported that Fahringer was doing better since the surgery, and that she had a lot less pain. By May, 1999, five months after the benefits definition change, Dr. Hefferen reported that he did not think Fahringer could do sedentary work because she had pain all over, especially in her hands.

However, in August, 1999, Paul Revere's medical consultant, Dr. Theerman, reviewed Fahringer's file and acknowledged that although Fahringer's physician previously determined that she was capable of some type of work, Fahringer's physician now believed that there was no occupation which would accommodate her "myriad of problems." Dr. Theerman recommended video surveillance "to see if her alleged

impairments are consistent with her usual daily activities."

Video surveillance was conducted for three days in September, 1999 and for three days in October, 1999. This surveillance showed Fahringer spending full days of more than twelve hours doing errands, going to lunch and dinner, taking her children to and from school, shopping, walking, bending, lifting her daughter, walking up and down stairs, reaching into the back seat of her vehicle from the front, carrying bags, and working at a bingo hall. Dr. Theerman and a Paul Revere rehabilitation consultant reviewed the video surveillance, and both determined that Fahringer was capable of some sort of sedentary employment.

Thus, Paul Revere determined that Fahringer's condition did not meet the definition of total disability benefits under the "any occupation" provision. In summary, its decision was based on the following: 1) Fahringer's treating physician's statements and her medical records prior to January 1, 1999; 2) Fahringer's positive response to surgery as of March, 1999; 3) her capability of performing numerous daily activities as of September and October, 1999; and 4) Paul Revere's medical and rehabilitation consultants' reviews of Fahringer's entire file.

The fact that Paul Revere considered this evidence to be more persuasive than other evidence is not conclusive of arbitrary and capricious conduct. For example, the Social Security Administration's determination that Fahringer was disabled does not necessarily evidence that Fahringer is disabled under her insurance Plan. This is because SSA's benefits decision was based on "a uniform set of federal criteria," whereas Paul Revere's decision was based on the specific terms of the Atlanticare Plan. *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 1971, 155 L.Ed.2d 1034 (2003).

■ Additionally, Paul Revere was not required to give more weight to Fahringer's treating physicians' opinions than its own medical consultants' opinions. "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician ...." *Id.* at 1972. Furthermore, courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.*

Fahringer argues that her doctor's declaration that she was totally disabled in March, 2000 and June, 2001 supports that she was totally disabled as of January 1, 1999. As explained above, because the Plan definition of "total disability" changed on January 1, 1999, the critical inquiry is whether Fahringer's condition as of January 1, 1999 satisfied the definition of total disability from "any occupation." Thus, although the record as of the final appeal reflects that Fahringer's condition required additional surgeries in January, 2000 and June, 2001, and that her doctor declared her totally disabled from any occupation on March 14, 2000 (Admin. Rec. at 1525) and June 11, 2002 (*Id.* at 1652), only the record pertaining to Fahringer's condition as of January 1, 1999 is relevant.[3]

---

3. The May 26, 2000, July 3, 2000 and July 10, 2000 denial letters restate the same reasons for denying Fahringer benefits that were detailed in the March 9, 1999 and December 27, 1999 denial letters. The three year–2000 denial letters stated that Paul Revere considered eighteen additional documents submitted since the 1999 decisions, but none of this additional information affected its determination that Fahringer was not totally disabled from "any occupation" as of January 1, 1999. Thus, Fahringer's challenge to Dr. Bianchi's medical review is inconsequential.

Therefore, considering the extremely deferential standard of review, the broad definition of the "any occupation" provision, and the content of the relevant record, Paul Revere's determination to deny Fahringer total disability benefits was not arbitrary and capricious.

### E. Reimbursement of Social Security Benefits

■ Paul Revere also seeks summary judgment on its counterclaim against Fahringer for the reimbursement of benefits paid to Fahringer pursuant to the Plan's offset provision. Fahringer contests Paul Revere's claim on two grounds: 1) Paul Revere is not entitled to reimbursement for Social Security benefits paid on behalf of Fahringer's children; and, 2) Paul Revere may not recover benefits paid to Fahringer because the relief sought is not equitable.

#### 1. Social Security Paid on Behalf of Fahringer's Children—(PART II)

■ The offset of payments received by an insured's "dependents on account of her disability does not transgress the policy undergirding the Social Security Act." *Lamb v. Conn. Gen. Life Ins. Co.*, 643 F.2d 108, 112 (3d Cir.1981). Fahringer, however, contests that the Plan language permits reimbursement for Social Security benefits paid to her on behalf of her children. The Plan provides that "Long Term Disability Benefits are reduced by Other Income Benefits." (Admin. Rec. at 503.) "Other Income Benefits" "[m]ean those benefits shown below which apply to the Covered Individual or to the Individual's spouse, child or children, if shown.... These Other Income Benefits include income benefits from the following sources: ... Disability or retirement benefits under the Federal Social Security Act, as follows: (1) disability or unreduced retirement benefits for which you are eligible; (2) reduced retirement benefits paid to you." (*Id.* at 501.)

Fahringer argues that the "if shown" language requires that Paul Revere may reduce benefits by the amount of other income benefits paid to children only if the listed source "shows" that it applies to children. Fahringer contends that because the Social Security benefits source does not state that it applies to children, Paul Revere may not recover the benefits paid to Fahringer on behalf of her children.

■ Although traditional insurance contract interpretation rules in New Jersey require that ambiguous terms must be construed against the insurer, interpretation of ERISA benefits plans that give the plan administrator discretionary authority to construe the terms of the plan does not follow the principle of *contra proferentem.* Instead, a plan administrator's interpretation of plan terms must be reviewed under the arbitrary and capricious standard to determine whether the administrator's interpretation was reasonable. *See McElroy v. Smithkline Beecham Health & Welfare Benefits Trust Plan,* 340 F.3d 139, 142 (3d Cir.2003) (holding that when a plan's language is ambiguous, the plan administrator is authorized to interpret it, and a court "must defer to this interpretation unless it is arbitrary or capricious").

Here, the "Other Income Benefits" provision is ambiguous, and because it is ambiguous, Paul Revere had discretion to interpret it. Fahringer's interpretation is not untenable; however, Paul Revere's interpretation that the provision does provide for the recovery of benefits paid on behalf of Fahringer's children is reasonable under the arbitrary and capricious standard of review.

In addition to Social Security benefits, the "other income benefits" sources listed are: remuneration from the employer, income benefit plans, Railroad Retirement Act, Veterans Administration or any other

governmental agency, Worker's Compensation, and automobile insurance based on "no fault" coverage. (Admin. Rec. at 501.) Not one of these sources contains the words "child or children" in its description. Consequently, if the "if shown" language is construed to mean that the words "child or children" must appear in the description of the "other income benefits" sources in order for Paul Revere to be able to offset these benefits, then Paul Revere would not be permitted offset benefits from any of the "other income benefits" sources. This interpretation advocated by Fahringer would render meaningless the words "child or children" in the definition of "other income benefits." [4]

Thus, although the "if shown" language is ambiguous, Paul Revere's interpretation that it may recover Social Security benefits paid to Fahringer on behalf of her children is not unreasonable. Accordingly, its calculation of the amount overpaid to Fahringer based on benefits received by her as an individual and on behalf of her children is permissible under the terms of the Plan.

## 2. Paul Revere's Requested Relief— (PART III)

■ An insurance benefits plan is permitted to require the offset of Social Security benefits paid to an insured against amounts payable to the insured under his benefits plan. *Lamb*, 643 F.2d at 111. The United States Supreme Court addressed the issue of whether an insurance company may institute an action under § 1132(a)(3) [5] of ERISA to recover money from a beneficiary pursuant to the insurance plan's reimbursement provision.

*Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213–14, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). In *Knudson*, the defendant was a beneficiary under a benefits plan governed by ERISA. *Id.* at 207, 122 S.Ct. 708. After the defendant was seriously injured in an accident, the plaintiff insurance company paid much of the defendant's medical costs. *Id.* The benefits plan, however, included a reimbursement provision, which permitted the insurer to recover from the beneficiary any payment for benefits that the beneficiary was able to recover from a third party. *See id.* The beneficiary filed a state court action against certain third party tortfeasors, and just as the parties to that litigation reached a settlement, the insurer sued the beneficiary in federal court, seeking equitable restitution from any proceeds the beneficiary might recover from the third party tort-defendants. *See id.* at 208, 122 S.Ct. 708.

The Supreme Court held that ERISA did not authorize the type of action brought by the insurer, because the relief sought was actually legal, not equitable. *See id.* at 221, 122 S.Ct. 708. The Court explained that, in contrast to an action "at law," *i.e.* for breach of contract,

a plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession. A court of equity could then order a defendant to transfer title (in the case of the constructive trust) or to

---

**4.** The same logic is also applicable to the "individual's spouse" language. None of the other income benefits sources contains the words "individual's spouse."

**5.** "A civil action may be brought ... by a participant, beneficiary, or fiduciary (A) to

enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner. But where "the property [sought to be recovered] or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor," and the plaintiff "cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant]." Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.

*Id.* at 213–14, 122 S.Ct. 708 (citations omitted) (alterations in original). Applying these principles to the case before it, the Court determined that because the beneficiary did not have possession of the funds, and because the insurer was asserting that it was contractually entitled to the funds for benefits that it conferred, the insurer's action was not equitable and, thus, not permitted under § 1132(a)(3).

Here, Paul Revere's counterclaim for the reimbursement of benefits overpaid to Fahringer does not specify a basis of liability. Paul Revere asserts that it is "seek[ing] a judgment against the Counterclaim Defendant, Maxine Fahringer, in the amount of $36,936.22, together with costs of suit, attorneys' fees, and such other relief as the court may deem appropriate." (Def. Ans. at 5.) The wording of the counterclaim does not indicate whether Paul Revere is seeking an action at law for breach of contract or an action in equity for restitution. Furthermore, Paul Revere does not assert whether its claim is based on ERISA § 1132(a)(3) or state law.

Paul Revere's motion for summary judgment acknowledges *Knudson* and concedes that the difficulty in establishing the identification and present location of the funds paid to Fahringer precludes direct recovery of the funds from Fahringer. (Def. Mot. Summ. J. at 13.) Paul Revere, however, requests the Court to "permit Defendants to recover the overpaid benefits by requiring Ms. Fahringer to deposit future benefits from SSDI (the very benefits creating the overpayment situation) into a designated account in Court or elsewhere, or imposing a constructive trust or equitable lien upon such funds, from which the Plan can obtain its equitable restitution, until the overpaid benefits have been recovered." (*Id.* at 14.)

The content of Paul Revere's counterclaim and motion for summary judgment on its counterclaim does not enable the Court to provide Paul Revere with its requested relief. The basis of liability for Paul Revere's counterclaim is crucial-whether Paul Revere is seeking relief under ERISA or under state law is dispositive to the relief the Court may provide. From Paul Revere's brief in support of summary judgment, it can be surmised that it is now seeking equitable relief pursuant to § 1132(a)(3) as described in *Knudson*. Paul Revere, however, did not categorize its counterclaim as such, which precluded Fahringer from providing an appropriate answer and other responsive motions.

Furthermore, Paul Revere's suggested relief, the imposition of a constructive lien on Fahringer's future Social Security benefits, is prohibited. Under the Social Security Act, "The right of any person to any future payment . . . shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law." 42 U.S.C. § 407(a). First, *Knudson* is distinguishable from Fahringer's situation because it

did not involve Social Security benefits. Second, even though a court in equity may order an insured to provide restitution for funds she was required to reimburse under an insurance contract, a court may not attach a lien to an insured's future Social Security benefits to secure payment of that restitution. Thus, although Paul Revere was permitted to offset the benefits paid to Fahringer against the Social Security benefits she received, it is not permitted to have a security interest or lien on Fahringer's future Social Security benefits.

Therefore, because Paul Revere concedes that it is precluded from directly recovering the funds from Fahringer, and because a lien cannot be attached to Fahringer's Social Security benefits, Paul Revere's request that the Court enter a judgment ordering Fahringer to reimburse Paul Revere in the amount of $36,936.22, or that the Court enter an order imposing a constructive lien on Fahringer's Social Security benefits, cannot be granted.

### CONCLUSION

Paul Revere's determination that Fahringer did not meet the definition of "total disability" under the "any occupation" provision was not arbitrary and capricious (PART I). Furthermore, Paul Revere's interpretation of the Plan language regarding the offset of Social Security benefits paid to Fahringer on behalf of her children was reasonable (PART II). Finally, however, Paul Revere's requested relief on its counterclaim for the reimbursement of funds overpaid to Fahringer is unavailable (PART III).

Accordingly,

IT IS HEREBY ORDERED on this 2nd day of December, 2003 that Defendants' motion for summary judgment [22] is *GRANTED* as to PART I and PART II, and *DENIED* as to PART III.

IT IS FURTHER ORDERED that Plaintiff's cross-motion for summary judgment [24] is *DENIED* as to PART I and PART II, and *GRANTED* as to PART III.